**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 19-1059

PHILLIP ALIG; SARA J. ALIG; ROXANNE SHEA; DANIEL V. SHEA, Individually and on behalf of a class of persons,

Plaintiffs - Appellees,

v.

QUICKEN LOANS INC.; AMROCK INC., f/k/a Title Source, Inc., d/b/a Title Source Inc. of West Virginia, Incorporated,

Defendants - Appellants,

and

DEWEY V. GUIDA; APPRAISALS UNLIMITED, INC.; RICHARD HYETT,

Defendants.

Appeal from the United States District Court for the Northern District of West Virginia, at Wheeling. John Preston Bailey, District Judge. (5:12-cv-00114-JPB-JPM, 5:12-cv-00115-JPB)

Argued: October 27, 2020

Decided: March 10, 2021

Before NIEMEYER, WYNN, and FLOYD, Circuit Judges.

Affirmed in part and vacated and remanded in part by published opinion. Judge Wynn wrote the majority opinion, in which Judge Floyd joined. Judge Niemeyer wrote a dissenting opinion.

---

**ARGUED:** Theodore J. Boutrous, Jr., GIBSON, DUNN & CRUTCHER, LLP, Los Angeles, California, for Appellants. Deepak Gupta, GUPTA WESSLER PLLC, Washington, D.C., for Appellees. **ON BRIEF:** Helgi C. Walker, GIBSON, DUNN & CRUTCHER LLP, Washington, D.C.; William M. Jay, Thomas M. Hefferon, Brooks R. Brown, Keith Levenberg, Washington, D.C., Edwina B. Clarke, GOODWIN PROCTER LLP, Boston, Massachusetts, for Appellants. John W. Barrett, Jonathan R. Marshall, Charleston, West Virginia, Patricia M. Kipnis, BAILEY & GLASSER LLP, Cherry Hill, New Jersey; Gregory A. Beck, GUPTA WESSLER PLLC, Washington, D.C.; Jason E. Causey, James G. Bordas, Jr., BORDAS & BORDAS, PLLC, Wheeling, West Virginia, for Appellees.

---

WYNN, Circuit Judge:

Plaintiffs are a class of "[a]ll West Virginia citizens who refinanced" a total of 2,769 mortgages with Defendant Quicken Loans Inc. from 2004 to 2009, "for whom Quicken [Loans] obtained appraisals" from Defendant Amrock Inc., an appraisal management company formerly known as Title Source, Inc. ("TSI").[1] J.A. 627.[2]

Plaintiffs allege that pressure tactics used by Quicken Loans and TSI to influence home appraisers to raise appraisal values to obtain higher loan values on their homes constituted a breach of contract and unconscionable inducement under the West Virginia Consumer Credit and Protection Act. The district court agreed and granted summary judgment to Plaintiffs.

We agree with the district court that class certification is appropriate and that Plaintiffs are entitled to summary judgment on their statutory claim. However, we conclude that the district court erred in its analysis of the breach-of-contract claim. Accordingly, we affirm in part and vacate and remand in part.

I.

Viewing the evidence in the light most favorable to Defendants, the record shows the following.[3]

---

[1] For ease of reference, we continue to refer to this entity as TSI throughout this opinion.

[2] Citations to "J.A. __" and "S.J.A. __" refer, respectively, to the Joint Appendix and Sealed Joint Appendix filed by the parties in this appeal.

[3] We consider only the evidence presented at the summary judgment stage. *See Rohrbough v. Wyeth Laboratories, Inc.*, 916 F.2d 970, 973 n.8 (4th Cir. 1990) (declining to consider "several documents that were not before the district court when it considered

In refinancing mortgages for thousands of West Virginia homes during the class period, Quicken Loans asked potential borrowers to complete an application; sign a uniform deposit agreement authorizing Quicken Loans to "advance out-of-pocket expenses on [the borrower's] behalf" for an appraisal, a credit report, or both; and provide a deposit averaging $350. J.A. 381. Quicken Loans also collected information from potential borrowers, including an estimated value of their homes.

Quicken Loans relayed the borrower's estimates of value to TSI, which passed those estimates on to contracted appraisers via appraisal engagement letters. If an appraisal came back lower than the estimated value, appraisers received phone calls from TSI drawing their attention to the estimated value and asking them to take another look. There is no evidence to suggest that borrowers were aware of these practices.

Plaintiffs' and Defendants' experts agreed that, during the class period, providing the borrower's estimate of value to the appraiser was common in the industry. Additionally, although the 2008–2009 Uniform Standards of Professional Appraisal Practice ("Uniform Appraisal Standards") indicated that appraisers could not ethically accept an appraisal assignment with a specific value listed as a *condition*, the chairman of the organization that issues the Uniform Appraisal Standards testified that an appraiser did not violate those standards merely by accepting an assignment that included an owner's estimate of value.

---

[the] motion for summary judgment"); *see also Kaiser Aluminum & Chem. Corp. v. Westinghouse Elec. Corp.*, 981 F.2d 136, 140 (4th Cir. 1992) ("It is well established that affidavits and exhibits not before the court in making its decision are not to be considered on appeal."); *cf. Bogart v. Chapell*, 396 F.3d 548, 558 (4th Cir. 2005) ("Generally, we will not examine evidence . . . that was inexcusably proffered to the district court only after the court had entered its final judgment.").

The record includes significant testimony from appraisers that borrowers' estimates of value did not influence them. Finally, the record includes testimony that the estimated value served the legitimate purposes of helping appraisers determine whether to accept an assignment and, upon acceptance, assess an appropriate fee.

Nevertheless, authorities warned lenders before and during the class period that providing estimated values to appraisers was improper. For instance, a 1996 letter from the U.S. Department of Housing and Urban Development to mortgagees instructed that appraisers were required to certify "that the appraisal [was] not based on a requested minimum valuation, [or] a specific valuation or range of values." S.J.A. 857. A 1999 letter from the Office of the Comptroller of the Currency to the Appraisal Standards Board voiced some concern with the practice of providing the owner's estimate of value and warned "employees of financial institutions" against "pressuring appraisers to raise their value conclusions to target values." S.J.A. 861. And in 2005, the Office of the Comptroller of the Currency noted that "the information provided by the regulated institution should not unduly influence the appraiser or *in any way suggest the property's value.*" Off. of the Comptroller of the Currency et al., *Frequently Asked Questions on the Appraisal Regulations and the Interagency Statement on Independent Appraisal and Evaluation Functions*, Fed. Deposit Ins. Corp. (Mar. 22, 2005), https://www.fdic.gov/news/news/financial/2005/fil2005a.html (emphasis added) (saved as ECF opinion attachment). While the 2005 guidance was not binding on Defendants, it is relevant to understanding regulators' thoughts on the issue at the time.

Furthermore, during the class period, Defendants stopped providing appraisers with estimated home values in other states—such as neighboring Ohio—where lenders faced mounting legal pressure against the practice. And they ceased the practice altogether in 2009, "right around the time that the [Home] Valuation Code of Conduct was agreed to and defined for the marketplace." J.A. 235. That Code of Conduct prohibits lenders or appraisal management companies from providing an estimated value to an appraiser in a refinancing transaction.[4] By 2011, Quicken Loans itself recognized that "influenc[ing] the appraiser to set [the] home at any certain value . . . . is illegal and unethical." J.A. 107.

The record thus indicates that the acceptability of this practice shifted dramatically during the class period. What started out as a common (though questionable) practice became one that, in short order, was explicitly forbidden—and viewed as unethical by Quicken Loans itself.

Yet the record reveals no such qualms on the part of Defendants during the class period. In one internal email from 2007, which had the subject line "Asking for the max increase available," an Operations Director for Quicken Loans wrote that TSI was "getting a lot of calls from appraisers stating that they can't reach *our requested value* and asking

---

[4] "No employee, director, officer, or agent of the lender, or any other third party acting as . . . appraisal management . . . on behalf of the lender, shall influence or attempt to influence the development, reporting, result, or review of an appraisal through coercion, extortion, collusion, compensation, inducement, intimidation, bribery, or in any other manner including but not limited to . . . providing to an appraiser an anticipated, estimated, encouraged, or desired value for a subject property or a proposed or target amount to be loaned to the borrower, except that a copy of the sales contract for purchase transactions may be provided[.]" *Home Valuation Code of Conduct*, Freddie Mac 1 (Dec. 23, 2008), http://www.freddiemac.com/singlefamily/pdf/122308_valuationcodeofconduct.pdf (saved as ECF opinion attachment).

6

what should they do." District Ct. Docket No. 206-2 at 39 (emphasis added). He instructed employees to include in value-appeal requests "something along the lines of 'any additional value would be appreciated.'" *Id.* A second email from a different Quicken Loans employee a few weeks later suggests that Quicken Loans' usual process at the time involved ordering value appeals and second appraisals, as well as "arguing over value appeal orders and debating values with bankers and appraisers."[5] S.J.A. 711. The email continued:

> [Fannie Mae] is being dragged into a law suit [sic] in the state of New York over lender pressure on appraisals. I don't think the media or any other mortgage company . . . would like *the fact we have a team who is responsible to push back on appraisers questioning their appraised values*. . . . Ohio is very specific in regards to asking for appeals and they say it is illegal. Other[] states I am sure will jump on board.

*Id.* (emphasis added). One recipient of the latter email testified in 2009 that the purpose of providing the estimated value was to "give[] an appraiser an ability to see what they are going to potentially look at the property at [sic]" and to "give[] them a heads up as to what the client thinks the home is worth." S.J.A. 709.

Dewey Guida, an appraiser routinely contracted by Quicken Loans and TSI, testified during a deposition that prior to 2009, TSI *always* included the borrower's estimate of value, but he could not recall whether other companies did so. He agreed that these estimated values were a "tip-off." S.J.A. 674. He testified that he largely ignored the

---

[5] The practice of "ordering, obtaining, using, or paying for a second or subsequent appraisal . . . in connection with a mortgage financing transaction" was later forbidden by the Home Valuation Code of Conduct, with certain limited exceptions. *Home Valuation Code of Conduct, supra* note 4, at 2.

estimated value "unless the value didn't come in. Then we received some phone calls about it[.]" S.J.A. 669. If the appraisal "wasn't at the estimated value," he clarified, "I would get a call on it" from TSI "with the value." *Id.* These calls were "[v]ery vague," but in essence, Defendants were saying: "We had an estimated value of this amount of money. You appraised at this amount. . . . [C]ould you relook at it? . . . [I]s there a reason why?" *Id.*

Class representatives Phillip and Sara Alig refinanced their mortgage through Quicken Loans in 2007. The Aligs estimated their home to be worth $129,000, and Quicken Loans passed this information along to TSI, who, in turn, passed it on to Guida. Guida appraised the home to be worth $122,500. He then received a request from Defendants to revisit the appraisal and raise it to $125,500 based on a modification to the data points for the closest comparison house. Guida testified that such requests from his clients for "straight value increase[s]" were not common, but he acknowledged that he complied and raised the appraised value to $125,500, though he could not recall doing so. S.J.A. 671. The Aligs obtained a loan from Quicken Loans for about $113,000. Plaintiffs' two experts estimated that the actual 2007 value of the Aligs' home was $99,500 or $105,000, respectively.

Plaintiffs brought actions against Quicken Loans, TSI, and three other defendants in West Virginia state court in 2011 which were removed to federal court in 2012.[6] After

---

[6] In addition to Quicken Loans and TSI, Plaintiffs' complaint named as defendants two appraisers, Guida and Richard Hyett, as well as Appraisals Unlimited, Inc., where Guida served as president. Moreover, the complaint proposed a defendant class, represented by Guida, Hyett, and Appraisals Unlimited, of appraisers "who receive

8

a winnowing of the claims and defendants, three claims remain: (1) a civil conspiracy claim against both Quicken Loans and TSI; (2) a claim of unconscionable inducement to contract under the West Virginia Consumer Credit and Protection Act against Quicken Loans; and (3) a breach-of-contract claim against Quicken Loans.[7]

The district court conditionally certified Plaintiffs' class and granted in part and denied in part each of the parties' motions for summary judgment. The court then held an evidentiary hearing on damages, after which it imposed a statutory penalty of $3,500 as to unconscionability for each of the 2,769 violations, for a total of $9,691,500. The court also awarded Plaintiffs the appraisal fees they had paid as damages for breach of contract, for a total of $968,702.95. The court did not award separate damages for conspiracy.

II.

---

appraisal assignments from Quicken [Loans] that improperly include the targeted appraisal figure Quicken [Loans] needs to issue the loans." J.A. 61.

[7] The complaint brought ten claims: (1) civil conspiracy, against all defendants; (2) unfair or deceptive acts or practices in violation of W. Va. Code § 46A-6-104, against all defendants; (3) excessive fees in violation of W. Va. Code § 31-17-8(c), (g), and (m)(1), against Quicken Loans; (4) unconscionable inducement to contract, against Quicken Loans; (5) accepting assignments listing target value numbers on appraisal request forms and accepting fees contingent upon the reporting of a predetermined appraisal value, in violation of W. Va. Code § 30-38-12(3) and -17, against Guida, Hyett, Appraisals Unlimited, and the proposed appraiser class; (6) charging illegal fees in violation of W. Va. Code § 46A-2-128(d), against Quicken Loans; (7) breach of contract, against Quicken Loans; (8) negligence and negligence per se, against all defendants; (9) fraudulent or intentional misrepresentation, against all defendants by the named plaintiffs only; and (10) making illegal loans in excess of the fair market value of the property in violation of W. Va. Code § 31-17-8(m)(8), against all defendants by the named plaintiffs only. Only counts 1, 4, and 7 are at issue in this appeal.

9

On appeal, Defendants first challenge the district court's decision to certify the class under Rule 23. Defendants argue that individual issues predominate over common ones, precluding class treatment. We disagree and affirm the district court's decision to certify the class.

A.

This Court reviews a class-certification decision for abuse of discretion.[8] *See Sharp Farms v. Speaks*, 917 F.3d 276, 290 (4th Cir. 2019) (certification); *Brown v. Nucor Corp.*,

---

[8] We reject Defendants' contention that we should instead apply an unspecified level of "heightened scrutiny" because much of the language of the district court's opinions closely tracked that of Plaintiffs' briefs. Opening Br. at 16. In arguing for "heightened scrutiny," Defendants rely on this Court's decision in *Chicopee Manufacturing Corp. v. Kendall Co.*, 288 F.2d 719 (4th Cir. 1961).

That reliance is misplaced. *Chicopee* belongs to a line of Fourth Circuit cases that the Supreme Court limited long ago. *See Anderson v. City of Bessemer City*, 717 F.2d 149 (4th Cir. 1983), *rev'd*, 470 U.S. 564 (1985). In *Anderson*, we cited *Chicopee* and similar cases to support "[o]ur close scrutiny of the record" where the district court had directed the plaintiff's counsel to submit proposed findings of fact and conclusions of law and then partially incorporated them into the court's final order. *Id.* at 156; *see id.* at 152. The Supreme Court reversed, noting that the district court "d[id] not appear to have uncritically accepted findings prepared without judicial guidance by the prevailing party." 470 U.S. at 572. Instead, "the findings it ultimately issued . . . var[ied] considerably in organization and content from those submitted by petitioner's counsel." *Id.* at 572–73. Thus, the Supreme Court concluded that "[t]here [wa]s no reason to subject those findings to a more stringent appellate review than is called for by the applicable rules." *Id.* at 573.

Following *Anderson*, we have taken a more lenient approach to district court opinions that closely mirror a party's submissions. *See, e.g.*, *Aiken Cnty. v. BSP Div. of Envirotech Corp.*, 866 F.2d 661, 676–77 (4th Cir. 1989) (holding that a district court's near-verbatim adoption of an ex parte proposed order was not improper where the opposing party had the opportunity to air its views fully and the court appeared to have exercised independent judgment).

The circumstances of this case pass muster under *Anderson* and *Aiken County*. The district court engaged extensively with the issues over several years. There is substantial evidence that the court exercised independent judgment. While the court's opinion adopted significant language from Plaintiffs' briefs, it also included substantial sections the court

10

785 F.3d 895, 901 (4th Cir. 2015) (decertification); *see also Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 654 (4th Cir.) ("Our review of class certification issues is deferential[.]"), *cert. denied*, 140 S. Ct. 676 (2019). "A district court abuses its discretion when it materially misapplies the requirements of [Federal] Rule [of Civil Procedure] 23," *EQT Prod. Co. v. Adair*, 764 F.3d 347, 357 (4th Cir. 2014), or "makes an error of law or clearly errs in its factual findings," *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 317 (4th Cir. 2006).

B.

A plaintiff seeking class certification under Rule 23 has the burden of demonstrating that the class satisfies the requirements for class-wide adjudication. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). The plaintiff must establish several "threshold requirements applicable to all class actions, commonly referred to as 'numerosity,' 'commonality,' 'typicality,' and 'adequacy.'" *Krakauer*, 925 F.3d at 654 (citing Fed. R. Civ. P. 23(a)). Rule 23 also contains an implicit requirement of ascertainability. *Id.* at 654–55. To obtain certification under Rule 23(b)(3), the plaintiff must additionally show that "[1] questions of law and fact common to class members *predominate* over any questions affecting only individual class members, and [2] that a class action is *superior* to other available methods for fairly and efficiently adjudicating the controversy." *Id.* at 655

wrote itself—as well as language adopted from *Defendants'* briefs. And, relevant to the class-certification question, the record shows that the court conducted its own Rule 23 analysis. The opinion "var[ies] considerably in organization and content from" Plaintiffs' briefs, and "[t]here is no reason to subject" the court's class-certification decision "to a more stringent appellate review than is called for by the applicable rules." *Anderson*, 470 U.S. at 572–73.

(alterations in original) (emphases added) (citing Fed. R. Civ. P. 23(b)(3)). Here, Defendants challenge the class certification only on the issue of predominance.

The district court concluded that the central question underlying the statutory unconscionable-inducement claim was whether Defendants' practice of providing the borrowers' estimates of value to appraisers was unconscionable conduct under the West Virginia Consumer Credit and Protection Act. Because that analysis focused on Defendants' behavior, the district court concluded that it concerned questions of law and fact common to all class members. Additionally, the court determined that the statutory damages could be determined class-wide at a set amount.

As for breach of contract, the parties stipulated that the named plaintiffs' interest-rate disclosures and deposit agreements were "representative of the standard deposit agreements used by Quicken Loans" throughout the class period. J.A. 185. Thus, the court concluded that questions of fact concerning the breach-of-contract claim could be resolved class-wide. And while individual evidence was required to determine the amount each class member paid for their appraisal—the cost the district court used to calculate the breach-of-contract damages award—Defendants have not suggested that evidence is difficult to obtain.

Nevertheless, on appeal, Defendants contend that individualized issues predominate. They argue that questions of standing, their statute-of-limitations defense, the unconscionable-inducement analysis, various breach-of-contract issues, and the

12

calculation of damages all require individual determinations that should defeat class certification. We are not persuaded.

1.

First, Defendants argue that a significant number of the class members are uninjured and therefore lack standing. The question of class members' standing "can be seen as implicating either the jurisdiction of the court under Article III or the procedural issues embedded within Rule 23's requirements for class certification." *Krakauer*, 925 F.3d at 652. While we review class-certification questions for abuse of discretion, our review of our Article III jurisdiction is de novo. *See Curtis v. Propel Prop. Tax Funding, LLC*, 915 F.3d 234, 240 (4th Cir. 2019).

Defendants argue that there are class members who have not suffered any injury. Accordingly, in Defendants' view, the district court lacked Article III power to award damages to those class members. And moreover, they argue, the district court should not have certified a class containing uninjured members. But whether framed through Article III or Rule 23, Defendants' arguments lack merit.

Plaintiffs paid an average of $350 for independent appraisals that, as we conclude below, they never received. Instead, they received appraisals that were tainted when Defendants exposed the appraisers to the borrowers' estimates of value and pressured them to reach those values. Of course, "financial harm is a classic and paradigmatic form of injury in fact," *Air Evac EMS, Inc., v. Cheatham*, 910 F.3d 751, 760 (4th Cir. 2018) (quoting *Cottrell v. Alcon Laboratories*, 874 F.3d 154, 163 (3rd Cir. 2017)), and "[f]or standing purposes, a loss of even a small amount of money is ordinarily an 'injury,'"

*Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017) (citing *McGowan v. Maryland*, 366 U.S. 420, 430–431 (1961), in which the Court concluded that "appellants fined $5 plus costs had standing").

Defendants argue that Plaintiffs were not injured because they benefitted from obtaining the loans. Even if that is true, "[o]nce injury is shown, no attempt is made to ask whether the injury is outweighed by benefits the plaintiff has enjoyed from the relationship with the defendant. Standing is recognized to complain that *some particular aspect* of the relationship is unlawful and has caused injury." 13A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3531.4 (3d ed. 2008 & Supp. 2020) (emphasis added); *see, e.g.*, *Allco Fin. Ltd. v. Klee*, 861 F.3d 82, 95 n.10 (2d Cir. 2017) ("[T]he fact that an injury may be outweighed by other benefits, while often sufficient to defeat a claim for damages, does not negate standing." (quoting *Ross v. Bank of Am., N.A. (USA)*, 524 F.3d 217, 222 (2d Cir. 2008))).[9] In sum, "there is simply not a large number of uninjured persons included within the plaintiffs' class." *Krakauer*, 925 F.3d at 658.

---

[9] This is not a case where facts related to the same transaction demonstrate there was never an injury in the first place. *See Texas v. United States*, 809 F.3d 134, 155–56 & n.59 (5th Cir. 2015) (collecting cases and distinguishing *Henderson v. Stalder*, 287 F.3d 374, 379 (5th Cir. 2002), in which the Fifth Circuit had declined to find taxpayer standing where it did not appear that the taxpayers actually had to pay for the program at issue, and noting that in *Henderson*, "the extra fees paid by drivers who purchased the [challenged license] plates could have covered the associated expenses"; since "[t]he costs and benefits arose out of the same transaction, . . . the plaintiffs had not demonstrated injury"), *aff'd by an equally divided Court*, 136 S. Ct. 2271, 2272 (2016). Here, there is no doubt that Plaintiffs actually paid for the appraisal, and thus were injured. We decline to apply the "same transaction" test more broadly than our sister circuit did in *Texas* and contrary to the general rule that benefits conferred upon a plaintiff by a defendant cannot defeat standing.

2.

Next, the statute-of-limitations question is straightforward and susceptible to class-wide determination.[10] When Plaintiffs commenced this suit in 2011, the statute of limitations for the unconscionable-inducement claim was "one year after the due date of the last scheduled payment of the agreement." W. Va. Code § 46A-5-101(1) (2011).[11] Here, the district court pointed to several ways in which Defendants could perform the "ministerial exercise" of determining which loans fell outside the applicable limitations period.[12] J.A. 433. Section 46A-5-101(1)'s objective test for determining the limitations period distinguishes this case from those where the statute of limitations depended on, for example, determining when the cause of action accrued—a question that requires analyzing "the contents of the plaintiff's mind." *Thorn*, 445 F.3d at 320.

Notwithstanding this straightforward analysis, Defendants seek to attack the district court's *alternative* conclusion that even if Defendants could demonstrate that some of

---

[10] This defense relates only to the statutory and conspiracy claims, which have the same statute of limitations for purposes of this case. *See Dunn v. Rockwell*, 689 S.E.2d 255, 269 (W. Va. 2009) ("[T]he statute of limitation for a civil conspiracy claim is determined by the nature of the underlying conduct on which the claim of conspiracy is based[.]"). Defendants have not suggested that Plaintiffs' contract claims—which are subject to a ten-year limitations period—are time-barred. *See* W. Va. Code § 55-2-6.

[11] After a 2015 amendment, the statute now provides a limitations period of "four years after the violations occurred." 2015 W. Va. Acts ch. 63 (codified at W. Va. Code § 46A-5-101(1)). Plaintiffs do not argue that the new limitations period applies retroactively. *Cf. Cruz v. Maypa*, 773 F.3d 138, 144 (4th Cir. 2014) (describing the analysis required for determining whether a statute lengthening the limitations period applies retroactively).

[12] At the initial class-certification phase, Defendants provided no evidence of any loans falling outside the limitations period. Defendants later located evidence of only three such loans.

15

Plaintiffs' claims were untimely, equitable tolling would apply. Defendants argue that equitable tolling requires individual determinations that counsel against class certification. That may be correct. *E.g.*, *EQT Prod. Co.*, 764 F.3d at 370. But the district court's class-certification order is not dependent on this alternative ground.

3.

Defendants also argue that Plaintiffs' unconscionable-inducement claims must be analyzed individually. They contend that Plaintiffs needed to prove that they were "actually induced to enter into a loan by the challenged practice," which would require peering into each class member's state of mind at the time of the loan signing. Opening Br. at 38. This argument implicates the merits of the unconscionable-inducement claim, which we discuss in detail below.

For present purposes, suffice it to say that we conclude Plaintiffs need only show misconduct on the part of Defendants, and concealment thereof, relating to a key aspect of the loan-formation process which necessarily contributed to the class members' decisions to enter the loan agreements. This is a determination that can be made across the class, since (1) for every member of the class, Defendants engaged in the same allegedly unconscionable practice—sharing borrowers' estimates of value with appraisers while failing to disclose that practice to Plaintiffs, and (2) unconscionable behavior affecting the

16

appraised value of a property inherently impacts the borrower's decision to obtain a loan based on that number.

4.

Turning to the contract claim, Defendants first allege that Plaintiffs failed to perform their end of the contract. They base this assertion on the dubious ground that the record supports that *some* homeowners (not specifically any member of the class) *sometimes* seek to persuade appraisers to increase their appraisal values. Even if that evidence could be enough to suggest that the *class members* attempted to influence the appraisers, we conclude that Plaintiffs fully performed by paying the agreed-upon deposit.

Defendants also argue that the contractual element of damages should have been litigated on an individual basis. They contend that there are no damages, and thus there can be no breach of contract, if the appraiser would have reached the same result with or without the borrower's estimate of value. For example, even assuming that the borrower's estimate of value influenced the appraiser, one might expect the resulting appraisal to be the same with or without exposure to that value if the borrower's estimate of value was accurate. But even if such evidence is necessary—a question we address below—it can be evaluated through the ministerial exercise of comparing actual home values to estimates of value.

5.

Finally, Defendants contend that the district court could not order statutory penalties class-wide, arguing that the court was required to consider the level of harm suffered by each class member individually. But the Supreme Court of Appeals of West Virginia has

17

clarified that "an award of civil penalties pursuant to" section 46A-5-101(1) is "conditioned only on a violation of a statute" and is permissible even for "those who have suffered no quantifiable harm" as long as they have been "subject to undesirable treatment described in [section 46A-2-121 or related provisions] of the [West Virginia Consumer Credit and Protection] Act."[13] *Vanderbilt Mortg. & Fin., Inc. v. Cole*, 740 S.E.2d 562, 566, 568–69 (W. Va. 2013). Moreover, the amount of damages "is within the sole province of the trial judge." *Id.* at 569. The district court acted within its discretion when it determined that the statutory damages could be assessed uniformly across the class.

Accordingly, we affirm the district court's decision to certify Plaintiffs' class.[14]

### III.

Having determined that Plaintiffs may pursue their claims as a class, we turn to the question of whether Defendants breached their contracts with each of the class members. We review de novo the district court's interpretation of state law, grant of summary judgment, and contract interpretation. *See Schwartz v. J.J.F. Mgmt. Servs., Inc.*, 922 F.3d 558, 563 (4th Cir. 2019); *Seabulk Offshore, Ltd. v. Am. Home Assurance Co.*, 377 F.3d

---

[13] We recognize that, in federal court, "a statutory violation *alone* does not create a concrete informational injury sufficient to support standing" for Article III purposes. *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 345 (4th Cir. 2017) (emphasis in original). There is no need to wade into that complicated area of the law here, however, because the class members suffered financial injuries sufficient to confer standing.

[14] Defendants have pointed to four loans for which the class member did not sign the stipulated document and therefore may not have paid a deposit. Of course, as federal courts, our Article III power limits us to providing relief for only those claimants who have been harmed, including in class actions. *See Lewis v. Casey*, 518 U.S. 343, 349 (1996). On remand, therefore, we instruct the district court to determine whether the class members who signed those four loans must be denied damages as to the unconscionable-inducement claim, the breach-of-contract claim, or both.

18

408, 418 (4th Cir. 2004). "Summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014) (internal quotation marks omitted).

For the reasons that follow, we conclude that the district court prematurely awarded summary judgment to Plaintiffs on their breach-of-contract claim. Accordingly, we vacate and remand for further proceedings.

## A.

"Because this case involves solely state-law matters, 'our role is to apply the governing state law, or, if necessary, predict how the state's highest court would rule on an unsettled issue.'" *Askew v. HRFC, LLC*, 810 F.3d 263, 266 (4th Cir. 2016) (quoting *Horace Mann Ins. Co. v. Gen. Star Nat'l Ins. Co.*, 514 F.3d 327, 329 (4th Cir. 2008)). Under West Virginia law, "[a] claim for breach of contract requires proof of the formation of a contract, a breach of the terms of that contract, and resulting damages." *Sneberger v. Morrison*, 776 S.E.2d 156, 171 (W. Va. 2015). We therefore begin our inquiry by considering whether the parties formed a contract at all.

Formation of a contract under West Virginia law requires "an offer and an acceptance supported by consideration." *Dan Ryan Builders, Inc. v. Nelson*, 737 S.E.2d 550, 556 (W. Va. 2012). The parties stipulated that the disclosures and agreements for the named plaintiffs' loans "are representative of the standard deposit agreements used by Quicken Loans" during the class period. J.A. 185. The named plaintiffs include both the Aligs, who serve as the class representatives, and another couple, Roxanne and Daniel Shea.

19

Two sections of the representative forms are relevant here. The first section, labeled

"DISCLOSURE" on the Sheas' form and unlabeled on the Aligs' form, provides:

> Lender will begin processing your application (which may include ordering an appraisal . . . ) immediately upon the submission of your application and deposit. . . . Lender's objective is to have your application fully processed . . . [before the] anticipated closing date. However, please note that some parts of this process aren't under Lender's control. For instance, Lender can't be responsible for delays in loan approval or closing due to . . . the untimely receipt of an acceptable appraisal . . . .

J.A. 381–82. The second section, labeled "DEPOSIT AGREEMENT" on both the Sheas'

and Aligs' forms, states:

> With your deposit . . . , you authorize Lender to begin processing your loan application and advance out-of-pocket expenses on your behalf to obtain an appraisal and/or credit report. . . . If your application is approved, at the closing, Lender will credit the amount of your deposit on your closing statement toward the cost of your appraisal and credit report. Any additional money will be credited to other closing costs. If your application is denied or withdrawn for any reason, Lender will refund your deposit less the cost of an appraisal and/or credit report.

J.A. 381.[15]

The district court concluded that Quicken Loans was obligated to provide each class

member with "an 'acceptable' appraisal, which, at a minimum, would require [it] to deal

[reasonably and] honestly with its borrowers." J.A. 409. The court appears to have based

this conclusion on the forms' reference to "the untimely receipt of an acceptable appraisal,"

---

[15] The above-quoted "Deposit Agreement" language comes from the Sheas' form. The language used on the Aligs' form is substantially and substantively the same, though not identical. *See* J.A. 382. The most significant difference is that the Aligs' form lacks the phrase "to obtain an appraisal and/or credit report." However, like the Sheas' form, the Aligs' form still specifies that the deposit is to be credited toward the cost of the appraisal and credit report.

from which the court deduced a contractual duty on the part of Quicken Loans to provide an "acceptable" appraisal. J.A. 381–82.

In our view, however, the natural reading of the key language—that Quicken Loans "can't be responsible for delays in loan approval or closing due to . . . the untimely receipt of an acceptable appraisal"—is to limit Quicken Loans' liability for delays, not to make promises as to the quality of the appraisal. J.A. 381–82. We therefore conclude that the text of the "Disclosure" section of the form signed by the Sheas and the untitled, yet identical section of the form signed by the Aligs does not create a contractual obligation for Quicken Loans to provide an "acceptable" appraisal.

But that is not the end of the matter because we hold that, instead, the forms create a contract in the Deposit Agreement section. The section is labeled "agreement" and includes an offer, acceptance, and consideration: Plaintiffs pay a deposit in exchange for Quicken Loans beginning the loan application process, which could include an appraisal or credit report. Plaintiffs' deposit is to be applied toward that cost regardless of whether the loan ultimately goes forward. Thus, Plaintiffs agreed to pay Quicken Loans for an appraisal or credit report. And because of how Plaintiffs' class is defined, all class members have necessarily paid for an appraisal.

We therefore agree with the district court that the parties formed a contract, albeit a different one from that found by the district court. But we conclude that whether *that* contract was breached—and whether there were resulting damages—are questions that the district court must review in the first instance. *See Fusaro v. Cogan*, 930 F.3d 241, 263 (4th Cir. 2019) ("We adhere . . . to the principle that the district court should have the first

21

opportunity to perform the applicable analysis."). In particular, the district court will need to address Defendants' contention that there were no damages suffered by those class members whose appraisals would have been the same whether or not the appraisers were aware of the borrowers' estimates of value—which one might expect, for example, if a borrower's estimate of value was accurate.

## B.

Plaintiffs urge us to uphold the district court's conclusion that "it was a necessary corollary of obtaining an appraisal that the [D]efendant[s] would obtain a fair, valid and reasonable appraisal of the property." J.A. 409. They contend that we may do so, even subtracting the word "acceptable" from the contract, by reference to the covenant of good faith and fair dealing. We agree that the covenant applies to the parties' contract. While the covenant may therefore come into play on remand, we conclude that it cannot by itself sustain the district court's decision at this stage.

## 1.

In West Virginia, there is an implied "covenant of good faith and fair dealing in every contract for purposes of evaluating a party's performance of that contract." *Evans v. United Bank, Inc.*, 775 S.E.2d 500, 509 (W. Va. 2015) (internal quotation marks omitted). The covenant requires "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." *Barn-Chestnut, Inc. v. CFM Dev. Corp.*, 457 S.E.2d 502, 508 (W. Va. 1995) (quoting *Ashland Oil, Inc. v. Donahue*, 223 S.E.2d 433, 440 (W. Va. 1976)) (discussing the covenant in the context of agreements governed by the Uniform Commercial Code).

22

Despite the Supreme Court of Appeals of West Virginia's broad statement in *Evans* that the covenant applies to *every* contract, Defendants imply that it is inapplicable here, noting in passing that "West Virginia courts have yet to apply the duty of good faith and fair dealing to a lender/borrower relationship in West Virginia." Opening Br. at 34 n.11 (citing *Quicken Loans, Inc. v. Brown*, 737 S.E.2d 640, 652 n.26 (W. Va. 2012)). Even assuming Defendants have preserved this issue,[16] we find their argument unpersuasive.

The case on which Defendants rely, *Quicken Loans v. Brown*, provides little guidance on the matter. In fact, in *Brown*, the Supreme Court of Appeals of West Virginia noted only that the "[p]laintiff also filed a claim for breach of the covenant of good faith and fair dealing, which the trial court found 'has not been applied to a lender/borrower relationship in West Virginia' and therefore was not addressed by the court." *Brown*, 737 S.E.2d at 652 n.26. The Court provided no further analysis.

Nevertheless, in more recent lender/borrower cases, the state Supreme Court has affirmed dismissal on the grounds that the plaintiffs' "failure to allege a breach of contract was fatal to their claim for a breach of the implied covenant of good faith and fair dealing." *Evans*, 775 S.E.2d at 509; *see also Brozik v. Parmer*, No. 16-0238, 2017 WL 65475, at *17 (W. Va. Jan. 6, 2017) (same). If the implied covenant was simply inapplicable to lender/borrower relationships, there would have been no need for the Court to engage in such analysis.

---

[16] "A party waives an argument by failing to . . . develop its argument—even if its brief takes a passing shot at the issue." *Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) (internal quotation marks and alterations omitted) (citing *Brown*, 785 F.3d at 923).

23

To be sure, *Evans* and *Brozik* do not explicitly hold that the implied covenant of good faith and fair dealing *does* apply to lender/borrower contracts. But given the presumption under West Virginia law that an implied covenant of good faith and fair dealing applies to every contract, we will not exclude lender/borrower cases from the ambit of that covenant in the absence of some affirmative direction from West Virginia courts to do so—particularly in light of the implication in *Evans* and *Brozik* that the covenant could apply in such cases when properly pleaded.

## 2.

Defendants are on stronger footing with their second argument. They contend that, even if the implied covenant can apply to lender/borrower contracts, West Virginia courts do not recognize a "freestanding claim of breach of the implied covenant of good faith and fair dealing where there is no breach of contract" and thus that Plaintiffs' claim under the covenant fails for lack of any breach of contract. Opening Br. at 34.

Defendants are correct that West Virginia law does not allow an independent claim for breach of the implied covenant unrelated to any alleged breach of contract. *Evans*, 775 S.E.2d at 509. Thus, the Supreme Court of Appeals of West Virginia has repeatedly held that plaintiffs cannot pursue a claim for breach of the implied covenant where they failed to allege breach of contract. *See id.*; *Brozik*, 2017 WL 65475, at *17 (same); *see also Gaddy Eng'g Co. v. Bowles Rice McDavid Graff & Love, LLP*, 746 S.E.2d 568, 578 (W. Va. 2013) (affirming summary judgment on good faith and fair dealing claim where trial court had "proper[ly] grant[ed] . . . summary judgment to the contract-based claims").

24

But here, Plaintiffs do not pursue a stand-alone claim of breach of the implied covenant of good faith and fair dealing. Rather, their complaint clearly alleges a claim of breach of contract and cites the implied covenant as relevant to that claim. That is proper under West Virginia law.

However, while Plaintiffs and the district court are correct that Quicken Loans was obligated to "obtain a fair, valid and reasonable appraisal of the property," that is only relevant for determining whether there was a breach. J.A. 409; *see Evans*, 775 S.E.2d at 509 (courts may consider the implied covenant of good faith and fair dealing when "evaluating a party's performance of th[e] contract" (quoting *Stand Energy Corp. v. Columbia Gas Transmission Corp.*, 373 F. Supp. 2d 631, 644 (S.D.W. Va. 2005))). There must also have been resulting damages for Plaintiffs' breach-of-contract claim to succeed. *See Sneberger*, 776 S.E.2d at 171. Accordingly, on remand, the district court may only grant summary judgment to Plaintiffs on the breach-of-contract claim if it concludes that (1) Quicken Loans breached its contracts with the class members, an analysis which may take into consideration how the covenant of good faith and fair dealing impacts the evaluation of Quicken Loans' performance under the contracts; and (2) the class members suffered damages as a result.

In sum, we conclude that a contract was formed between each class member and Quicken Loans. On remand, the district court should consider whether Plaintiffs have demonstrated an absence of genuine issues of material fact as to the other elements of a breach-of-contract claim. In conducting this analysis, the district court may consider the

25

implied covenant of good faith and fair dealing to the extent that it is relevant for evaluating Quicken Loans' performance of the contracts.[17] *Evans*, 775 S.E.2d at 509.

## IV.

We reach a different conclusion when it comes to Plaintiffs' claim under the West Virginia Consumer Credit and Protection Act (the "Act"). Although the claim is similar to the contract claim—in that both are based on Defendants' alleged misbehavior in the appraisal process—there is a key difference between the two: while breach of contract requires a demonstration of damages, the Act does not. Indeed, the Supreme Court of Appeals of West Virginia has made plain that the Act is to be construed broadly and that it is intended to fill gaps in consumer protection left by the common law, such as in breach-of-contract actions.

Prior to finalizing loan agreements with the class members, Defendants sought to pressure appraisers to inflate their appraisals of the class members' homes. For all class members, Defendants provided appraisers with estimated home values, and they at least sometimes followed up on appraisals that fell short of these targets with phone calls designed to persuade appraisers to reconsider their valuations. The record makes clear that, regardless of any legitimate objective Defendants had in providing the borrowers' estimates of value, they *also* provided those estimates to an unscrupulous end: inflating appraisals. The record demonstrates that this pressure tainted the appraisal process, and it

---

[17] Because we vacate the district court's decision to grant summary judgment on Plaintiffs' contract claim, we also vacate the court's award of damages for that claim. Accordingly, we do not reach Defendants' arguments regarding the district court's order of damages related to breach of contract.

is beyond dispute that the appraisal process was central to the formation of the loan agreements. Moreover, Defendants did not reveal this practice to Plaintiffs. Given the centrality of appraisals in loan formation, Defendants' concealment of the scheme to inflate appraisals was unconscionable behavior that contributed to Plaintiffs' decisions to enter the loan agreements. Thus, we affirm the district court's holding that Plaintiffs are entitled to summary judgment on their unconscionable-inducement claim.

## A.

As noted, we review the district court's interpretation of state law and grant of summary judgment de novo, *see Schwartz*, 922 F.3d at 563; *Seabulk Offshore*, 377 F.3d at 418, and summary judgment is only appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law, *Bostic*, 760 F.3d at 370.

Additionally, "[b]ecause federal jurisdiction in this matter rests in diversity, our role is to apply the governing state law." *Stahle v. CTS Corp.*, 817 F.3d 96, 99–100 (4th Cir. 2016) (footnote omitted). In deciding questions of state law, we first turn to the state's highest court and "giv[e] appropriate effect to all [the] implications" of its decisions. *Id.* at 100 (quoting *Assicurazioni Generali, S.p.A. v. Neil*, 160 F.3d 997, 1002 (4th Cir. 1998)). But "[i]f we are presented with an issue that [the state]'s highest court has not directly or indirectly addressed, we must anticipate how it would rule." *Liberty Univ., Inc. v. Citizens Ins. Co. of Am.*, 792 F.3d 520, 528 (4th Cir. 2015). "In making that prediction, we may consider lower court opinions in [the state], the teachings of treatises, and 'the practices of other states.'" *Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C.*, 433

F.3d 365, 369 (4th Cir. 2005) (quoting *Wade v. Danek Med., Inc.*, 182 F.3d 281, 286 (4th Cir. 1999)).

## B.

The West Virginia Consumer Credit and Protection Act authorizes a court to act when a loan agreement was "unconscionable at the time it was made" or "induced by unconscionable conduct." W. Va. Code § 46A-2-121(a)(1). The Act permits courts to "refuse to enforce the agreement" as well as to order actual damages and a penalty. *Id.* § 46A-2-121(a)(1); *see id.* § 46A-5-101(1). The statute "protect[s] consumers . . . by providing an avenue of relief for consumers who would otherwise have difficulty proving their case under a more traditional cause of action"—such as a common-law contract claim. *Barr v. NCB Mgmt. Servs., Inc.*, 711 S.E.2d 577, 583 (W. Va. 2011) (quoting *State ex rel. McGraw v. Scott Runyan Pontiac-Buick, Inc.*, 461 S.E.2d 516, 523 (1995)). Because the "[A]ct is clearly remedial in nature," the Supreme Court of Appeals of West Virginia has instructed that courts "must construe the statute liberally so as to furnish and accomplish all the purposes intended." *Id.* (quoting *McGraw*, 461 S.E.2d at 523).

Unconscionable inducement under the Act is broader in scope than both substantive unconscionability and the "traditional cause of action" of common-law fraudulent inducement. *Id.*; *see McFarland v. Wells Fargo Bank, N.A.*, 810 F.3d 273, 284 (4th Cir. 2016); *Brown*, 737 S.E.2d at 658. The Supreme Court of Appeals of West Virginia hinted at both conclusions in *Quicken Loans v. Brown*. In that case, a borrower complained that Quicken Loans unconscionably induced a loan by, among other things, including an estimated home value in its appraisal request form. *See Brown*, 737 S.E.2d at 648 & n.8.

28

The estimated home value was $262,500, and the appraiser—Dewey Guida, who also performed the appraisal of the Aligs' home in this case—valued it at $181,700. *Id.* The home's actual value was $46,000. *Id.* That Guida's appraisal was massively inflated should have been apparent to any observer, barring an extreme shift in the market, as the plaintiff had refinanced the mortgage on the property for between roughly $40,000 and $67,000 in the years immediately before obtaining the loan at issue. *Id.* at 647.

Nevertheless, Quicken Loans persuaded the plaintiff in a rushed closing process to refinance her home and assume a loan of $144,800—with a massive balloon payment to boot. *Id.* at 649–50. The trial court found that Quicken Loans engaged in common-law fraudulent inducement and unconscionable inducement under the Act by, among other things, negligently conducting the appraisal review. *Id.* at 652, 657. The Supreme Court of Appeals of West Virginia affirmed,[18] though it did not specifically reach the issue of the appraisal because it concluded that the balloon payment and Quicken Loans' false promises to the plaintiff were sufficient to support common-law fraudulent inducement. *Id.* at 652, 656, 658. Moreover, the Supreme Court concluded that that common-law violation alone was enough to find a statutory violation under the Act for unconscionable inducement. *Id.* at 658. Finally, the Supreme Court agreed with the lower court that the contract was substantively unconscionable, despite Quicken Loans' contention that the plaintiff received "benefits" from the loan. *Id.* at 658; *see id.* at 659.

---

[18] West Virginia's state-court system has no intermediate appellate courts.

29

This Court extrapolated from *Brown*'s reasoning in *McFarland v. Wells Fargo Bank*, predicting that the Act "is to be read as diverging from th[e] traditional understanding" of unconscionability. *McFarland*, 810 F.3d at 284. We noted that the Supreme Court of Appeals of West Virginia had "sustained findings of 'unconscionability in the inducement' based entirely on conduct predating acceptance of the contract and allegations going to the fairness of the process, without regard to substantive unconscionability." *Id.* Accordingly, we concluded that the Act "authoriz[es] a claim for unconscionable inducement that does not require a showing of substantive unconscionability."[19] *Id.*

Further, it is clear from *Brown* that an unconscionable-inducement claim is not defeated by a showing that the plaintiff benefitted from the resulting loan. *Brown*, 737 S.E.2d at 651, 658–59 (holding the defendant liable for statutory unconscionable inducement despite the fact that "[w]ith the loan proceeds, [the p]laintiff paid off her previous mortgage and consolidated debt; received $40,768.78, with which she purchased a new vehicle (for $28,536.90); [and] retired other existing debt").

Thus, unconscionable inducement is simply "unconscionable conduct that causes a party to enter into a loan." *McFarland*, 810 F.3d. at 285. Courts are to analyze such claims "based solely on factors predating acceptance of the contract and relating to the bargaining process," that is, "the process that led to contract formation." *Id.* at 277–78. Procedural

---

[19] By contrast, the other cause of action under the Act—where the agreement was "unconscionable at the time it was made"—"requires a showing of both substantive unconscionability, or unfairness in the contract itself, and procedural unconscionability, or unfairness in the bargaining process." *McFarland*, 810 F.23d at 277.

30

unfairness alone is insufficient—while procedural unconscionability can be shown by demonstrating severe discrepancies in the parties' bargaining positions, "it appears that [the unconscionable-inducement analysis] will turn not on status considerations *that are outside the control of the defendant*, but instead on *affirmative misrepresentations or active deceit*." *Id.* at 286 (emphases added). *McFarland*'s analysis on this point was prescient: a few months after the decision was filed, the West Virginia legislature amended the statute to include "affirmative misrepresentations, active deceit[,] or concealment of a material fact" as examples of "unconscionable conduct." 2016 W. Va. Acts. ch. 41 (codified at W. Va. Code § 46A-2-121). In other words, unconscionable inducement requires that the defendant have taken some unconscionable action within its control to forward the loan process.

Based on binding precedent from this Court and the state Supreme Court, then, some key principles guide our analysis. We are to construe the Act liberally. Its purpose is to protect consumers, especially where the common law cannot provide them with relief. Unconscionable inducement does not require substantive unconscionability in the loan itself, and any benefit the plaintiff received from that loan is irrelevant. Instead, unconscionable inducement relates only to contract formation. However, to prove unconscionable inducement, a plaintiff must show more than procedural unconscionability: he or she must demonstrate unconscionable behavior on the part of the defendant, such as an affirmative misrepresentation or active deceit.

31

C.

This leaves us to "anticipate how [the Supreme Court of Appeals of West Virginia] would rule" regarding one key question. *Liberty Univ.*, 792 F.3d at 528. By definition, the word "inducement" implies that the affirmative misrepresentation or active deceit in some way caused the plaintiff to enter the loan. Black's Law Dictionary defines "inducement" generally as "[t]he act or process of enticing or persuading another person to take a certain course of action," and, specific to contracts, as "[t]he benefit or advantage that causes a promisor to enter into a contract." *Inducement*, Black's Law Dictionary (11th ed. 2019). To resolve this appeal, we must predict the level of causality that the Supreme Court of Appeals of West Virginia would require.

We predict that plaintiffs alleging unconscionable inducement in the form of active deceit or concealment may succeed on their claims by proving that the defendants omitted information that corrupted a key part of the process leading to loan formation. Additionally, we predict that plaintiffs alleging unconscionable inducement based on affirmative misrepresentations must demonstrate that they relied on the defendants' affirmative misrepresentations in entering the loan. However, both predictions are based on West Virginia precedent that relates to other causes of action potentially calling for a *higher* level of causality than section 46A-2-121 requires. In other words, our predictions come with the caveat that we think it possible that the Supreme Court of Appeals of West Virginia would reduce the causality required even further for claims under section 46A-2-121. We need not press on into this uncharted territory of state law, however, because we may affirm the district court's judgment even under these more cautious predictions.

32

Discussing common-law fraudulent concealment in *Quicken Loans v. Brown*, the Supreme Court of Appeals of West Virginia held that "it is not necessary that the fraudulent concealment should be the sole consideration or inducement moving the plaintiff. If the concealment *contributed to the formation of the conclusion in the plaintiff's mind*, that is enough." *Brown*, 737 S.E.2d at 654 (emphasis added) (internal quotation marks and alterations omitted). And *Brown* makes clear that an act that constitutes common-law fraudulent inducement also constitutes unconscionable inducement under the Act. *See id.* at 658. Accordingly, for claims based on concealment, it "is enough" for a plaintiff to show that the defendant's concealment "contributed to the formation" of the plaintiff's decision to enter the loan.[20] *Id.* at 654.

Moreover, in *White v. Wyeth*, the Supreme Court of Appeals of West Virginia evaluated a different section of the Act that protects consumers when they purchase or lease goods or services. The court reasoned that "when consumers allege that a purchase was made because of an *express or affirmative misrepresentation*, the causal connection between the deceptive conduct and the loss would necessarily include *proof of reliance* on those overt representations." *White v. Wyeth*, 705 S.E.2d 828, 837 (W. Va. 2010) (emphases added). However, "[w]here *concealment, suppression or omission* is alleged,

---

[20] It is possible that the Supreme Court of Appeals of West Virginia would hold that the necessary showing of causality is even further reduced under the Act. Notably, *Brown* was discussing *common-law* fraudulent concealment. But because the Act is intended to fill the gaps left by the common law, *Barr*, 711 S.E.2d at 583, unconscionable inducement under the Act ought to be easier for plaintiffs to prove than common-law fraudulent inducement. We decline to make a prediction as to exactly what standard the state Supreme Court would apply, however, because we conclude that it is appropriate to affirm summary judgment for Plaintiffs even under *Brown*'s more exacting standard.

and *proving reliance is an impossibility*, the causal connection between the deceptive act and the ascertainable loss is established by presentation of facts showing that the deceptive conduct was the proximate cause of the loss." *Id.* (emphases added).

Importantly, the provision of the Act analyzed in *White* explicitly requires a showing of causation for a consumer to sue a merchant or service provider. W. Va. Code § 46A-6-106(a) (providing a private cause of action to a consumer who "purchases or leases goods or services and thereby suffers an ascertainable loss . . . *as a result of* the use or employment by another person of a method, act or practice prohibited" by the Act (emphasis added)). Here, by contrast, the relevant provision has no comparable language explicitly requiring causation for a plaintiff to sue a lender, except insofar as causation is implied by the concept of inducement. W. Va. Code § 46A-2-121(a)(1) (providing a cause of action where the court finds a consumer loan "to have been induced by unconscionable conduct"). Therefore, logic necessitates that, at most, the same standard regarding reliance articulated in *White* for section 46A-6-106(a) would apply to section 46A-2-121(a)(1): proof of subjective reliance is necessary for actions based on affirmative representations, but not for actions based on concealment.[21]

---

[21] Indeed, we think it possible that the state Supreme Court would conclude that reliance would be unnecessary for either affirmative representations *or* concealment in actions under section 46A-2-121(a)(1). Crucially, the court's reasoning in *White* was dependent on the specific language in section 46A-6-106(a). *White*, 705 S.E.2d at 833 (noting that the certified question before it was the proper interpretation of the "as a result of" language in section 46A-6-106(a)). And the current version of the Act specifically recognizes that some lawsuits against creditors or debt collectors will be class actions—but there is no comparable provision in the part of the Act at issue in *White*. *Compare* W. Va. Code Ann. § 46A-5-101(1), *with id.* § 46A-6-106. As Defendants themselves argue, it

34

As a point of clarification, we recognize that *White*'s language about deceptive conduct needing to be the "proximate cause of the loss"—or even the "but for" cause, *White*, 705 S.E.2d at 837—appears to impose a more stringent requirement for the showing of causation than does *Brown*'s language about the concealment merely needing to "contribute[] to the formation of the conclusion in the plaintiff's mind," *Brown*, 737 S.E.2d at 654. Here, between the two, *Brown* governs. *Brown* is more recent, and it dealt directly with inducement to enter a loan, whereas *White* related to a different statutory provision. Accordingly, we discuss *White* not for its causal language, but for its discussion of whether a plaintiff alleging concealment must prove reliance.

In summary, to assess a claim of unconscionable inducement under the Act, we look to the defendant's conduct, not the bargaining strength of the parties or the substantive terms of the agreement. For claims based on affirmative misrepresentations, plaintiffs must demonstrate that they subjectively relied on that conduct. For claims based on concealment, however, a plaintiff need only show that the defendant's conduct was unconscionable and that this unconscionable conduct contributed to the formation of the plaintiff's decision to enter the loan. In other words, we predict that the state Supreme Court would find that a plaintiff who proves unconscionable conduct in the form of concealment will recover

---

becomes much more difficult to resolve as a class action a claim requiring individualized proof of the class members' mindsets. *See* Opening Br. at 38; *see also Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 362 (4th Cir. 2004). We do not mean to imply that a class could never be certified under other provisions of the Act; that question is not before us. But we think it significant that the legislature explicitly contemplated that actions against creditors or debt collectors could employ the class-action vehicle, which suggests that no individualized inquiry is required.

unless the conduct was sufficiently attenuated from or irrelevant to the loan's formation such that it did not contribute to the formation of the plaintiff's decision to enter the loan.

D.

Turning to Defendants' conduct in this case, and viewing the evidence in the light most favorable to Defendants, we agree with the district court that Defendants sought to pressure appraisers to match targeted appraisal values and concealed this practice from Plaintiffs—a process that, in combination, contributed to Plaintiffs' decisions to enter the loan agreements. Under the standard outlined above, this conduct rises to the level of unconscionable inducement under the Act.

The record clearly shows that Defendants sought to increase appraisal values by providing borrowers' estimates of home value to its appraisers and pressuring appraisers to match those values. Defendants' internal emails refer to receiving "a lot of calls from appraisers stating that they can't reach *our requested value*." District Ct. Docket No. 206-2 at 39 (emphasis added). One appraiser, Guida, testified that "if [the appraisal] wasn't at the estimated value, [he] would get a call" from TSI asking him to reevaluate the appraisal. S.J.A. 669. In light of this testimony, the only reasonable inference is that the "requested value" in the email refers to the borrower's estimate of value. Internal emails also reveal that Quicken Loans had a team dedicated to "push[ing] back on appraisers questioning their appraised values," and that Quicken Loans' usual process involved "arguing over value appeal orders and debating values with bankers and appraisers." S.J.A. 711.

Moreover, Guida increased the appraised value of the Aligs' home by $3,000 after receiving documents from Defendants asking him to revisit the appraisal. Guida's revised

36

appraisal of the Aligs' home was between 19.5% and 26% higher than their actual home value. Of course, home valuation is to some degree an art, not a science; some variability is to be expected. But Defendants themselves have suggested that "a deviation of *10%* between values is common and accepted in the industry." J.A. 277 (emphasis added).[22]

While the record contains testimony from several appraisers that they were not influenced by the estimated values, it is unclear how many of the appraisals at issue were conducted by those appraisers. And regardless of whether the appraisers who conducted the class members' appraisals *believed* themselves to have been influenced, the record suggests that they were. Guida's appraisal of the Aligs' home provides a particularly stark example. But additionally, testimony from a Quicken Loans executive supports that the average difference between the estimated value and the appraisal value for all class loans was within five percent. In other words, the appraisals closely tracked the borrowers' estimates of value. This uncontroverted fact can be reconciled with the appraisers' testimony because it is a well-established psychological phenomenon that an initial value can have an anchoring effect, influencing later estimates without the estimator's

---

[22] The record is devoid of evidence regarding the actual home values of other class members. Accordingly, we cannot evaluate whether the appraisals for most class members were inflated. As noted above, that may preclude Plaintiffs' contract claim, which requires a showing of damages. But it does not preclude a statutory unconscionable-inducement claim, which does not require a showing of *substantive* unconscionability regarding the loan terms.

realization.[23] Studies have shown this to be true even for experts like real estate agents (for home prices) and judges (for sentencing decisions).[24]

Viewed in the light most favorable to Defendants, the record contains evidence that Defendants may have provided the estimates of value in part for legitimate reasons: helping appraisers determine whether to accept an assignment and, if accepted, assess an appropriate fee for the assignment. There is some dispute about whether appraisers actually used the estimates in that way. But there is no genuine dispute that Defendants *also* provided the estimates as a target—or, in their word, "requested"—value. Nor is there any genuine dispute that, at least some of the time, their efforts worked.

It is also clear that during the class period, this practice was common, but discouraged. Though it was not expressly forbidden by West Virginia law at the time, federal authorities indicated as early as 1996 that providing a target value to appraisers was improper, warning "employees of financial institutions" against "pressuring appraisers to raise their value conclusions to target values." S.J.A. 861. And the record suggests Defendants were aware that the practice of providing borrowers' estimates of value was

---

[23] *E.g.*, Jon D. Hanson & Douglas A. Kysar, *Taking Behavioralism Seriously: Some Evidence of Market Manipulation*, 112 Harv. L. Rev. 1420, 1440–41 & n.82 (1999) (describing the anchoring effect).

[24] *E.g.*, Mark W. Bennett, *Confronting Cognitive "Anchoring Effect" and "Blind Spot" Biases in Federal Sentencing: A Modest Solution for Reforming A Fundamental Flaw*, 104 J. Crim. L. & Criminology 489, 498 (2014) (discussing a study showing how "anchoring works at the subconscious level" for real estate agents estimating home values); *see also United States v. Parral-Dominguez*, 794 F.3d 440, 448 & n.9 (4th Cir. 2015) (noting the anchoring effect of the Sentencing Guidelines in the context of criminal sentencing).

inappropriate. They ceased doing so in at least one state that began applying more legal pressure. Yet in West Virginia, Defendants continued to forge ahead. They only stopped the practice entirely in 2009, "around the time" the Home Valuation Code of Conduct forbid it. J.A. 235. It was unethical for Defendants to attempt to pressure or influence appraisers—yet the record establishes that this was Defendants' goal.[25]

---

[25] At oral argument, Defendants relied heavily on a provision of the West Virginia Code that instructs that lenders "may rely upon a bona fide written appraisal of the property made by an independent third-party appraiser" which is "prepared in compliance" with the Uniform Appraisal Standards. W. Va. Code § 31-17-8(m)(8). Their theory was that, under the Uniform Appraisal Standards, it was not unethical for an appraiser to complete an appraisal after receiving an estimated value from the lender—and that this should absolve Defendants of any wrongdoing.

As an initial matter, Defendants waived this argument by raising it only in passing in their opening brief. *Grayson*, 856 F.3d at 316. In any event, it is without merit. Defendants are correct that, while the 2008–2009 Uniform Appraisal Standards indicated that appraisers could not ethically accept an appraisal assignment requiring a specific amount as a *condition*, the record supports that the mere receipt by an appraiser of the borrower's estimate of value did not violate the Uniform Appraisal Standards. However, the Uniform Appraisal Standards also indicated that appraisers should respond to lenders who provided the borrower's estimate of value with a clarifying statement that they could not accept the assignment if the estimate was provided as a condition. There is no evidence in the record that the appraisers made any such statements here.

Putting that issue aside, section 31-17-8(m)(8) cannot be used by lenders to justify unconscionable conduct. Section 31-17-8(m)(8) forbids lenders from "making any primary or subordinate mortgage loan" that is secured in a principal amount exceeding the fair market value of the property. In enacting that prohibition, however, the legislature gave lenders a safe harbor: they could rely on an appraiser's valuation of the home to avoid violating this rule. Reading the statute to allow lenders to attempt to influence appraisers so long as they stick within the limits of the Uniform Appraisal Standards—to wield this safe harbor *shield* as a *sword*—would defeat the purpose of section 31-17-8(m)(8), not to mention section 46A-2-121(a)(1).

Moreover, the state legislature used significant limiting language in crafting section 31-17-8(m)(8), specifying that the appraisal must be "bona fide" and that the appraiser must be "an independent third-party." And under section 31-17-8(m)(2), lenders are prohibited from "[c]ompensat[ing], . . . coerc[ing,] or intimidat[ing] an appraiser for the purpose of influencing the independent judgment of the appraiser with respect to the value

39

Indeed, Defendants appear to recognize that their conduct was improper. On appeal, they focus their energy on arguing that their attempts to influence appraisers were *unsuccessful* and, therefore, did not induce Plaintiffs to enter the loans. They note testimony from several appraisers that seeing borrowers' estimates of value did not influence them.

Defendants set the causational bar too high. As discussed, for claims related to concealment, unconscionable inducement under the Act turns not on Plaintiffs' subjective reliance on the concealed conduct but on Defendants' conduct itself. Plaintiffs need demonstrate only that Defendants' conduct was unconscionable and that it "contributed to the formation" of their decisions to enter the loan agreements. *Brown*, 737 S.E.2d at 654. We conclude that Plaintiffs have satisfied this standard.[26]

---

of real estate" on which a mortgage loan is based. The language of section 31-17-8(m) thus makes clear that the legislature was concerned about the very sort of behavior at issue here—namely, lenders embarking on campaigns to sway appraisers.

[26] Defendants argue that concealment is only actionable where there is a duty to disclose—and they appear to argue that the absence of a *statutory* duty is dispositive. As an initial matter, the absence of a statutory duty does not mean there is no duty. In the tort context, for example, "[t]he ultimate test of the existence of a duty to use care is found in the foreseeability that harm may result if it is not exercised." *Glascock v. City Nat'l Bank of W. Va.*, 576 S.E.2d 540, 544 (W. Va. 2002) (internal quotation marks omitted). And, where a lender "possesse[s] information of no interest to 'society in general,' but of great interest to the [borrowers]," and the lender "ha[s] reason to know of the 'potential consequences of the wrongdoing,' that is, withholding the information," a special relationship exists and the lender has a duty to disclose the information. *Id.* at 545; *see id.* at 546; *cf. McCauley v. Home Loan Inv. Bank, F.S.B.*, 710 F.3d 551, 559 (4th Cir. 2013) ("A lender that informs a borrower about how much her property is worth, whether required to do so or not, is under an obligation not to misrepresent that value."); *Ranson v. Bank of Am., N.A.*, No. CIV.A. 3:12-5616, 2013 WL 1077093, at *6 (S.D.W. Va. Mar. 14, 2013) ("[A] duty to provide accurate loan information is a normal service in a lender-borrower relationship.").

40

The appraisal process is closely related to loan formation for loans secured by the collateral of real property. In other words, any conduct impacting the appraisal process necessarily contributes to loan formation. An appraisal provides both the mortgagor and mortgagee with a baseline value from which the parties can negotiate the terms of the loan. The appraisal value helps determine the final loan amount and terms, and an impartial appraisal gives both parties confidence that the loan is tied to the home's true contemporary market value.

Appraisal procedures are particularly important in refinancing agreements. In home purchases, the loan amount is tied directly to the purchase price, which is tempered by bargaining between adversarial parties represented by competing real estate agents. Here, though, both parties had some incentive to estimate a high home value: Plaintiffs may have wanted to receive more money they could use for other purposes, *cf. McFarland*, 810 F.3d

---

Moreover, there is no evidence that a duty to disclose is an element of an action for unconscionable inducement by concealment under the Act. Defendants are correct that *common-law* fraudulent concealment requires the plaintiff to show the existence of a duty to disclose. *Brown*, 737 S.E.2d at 654. But, again, the Act is intended to provide consumers with a cause of action where the common law does not. *Barr*, 711 S.E.2d at 583. And research has not revealed a single West Virginia case interpreting the Act that has required a duty to disclose. Indeed, in *Brown*, the Supreme Court of Appeals of West Virginia referred to a duty to disclose only in discussing the plaintiff's common-law claim for fraudulent concealment. *Brown*, 737 S.E.2d at 654. And the trial court in *Brown*—the only other West Virginia court to review the case—made no mention of a duty to disclose in this context at all. *Brown v. Quicken Loans*, No. 08-C-36, 2010 WL 9597654, at *8 (W. Va. Cir. Ct. Mar. 2, 2010).

In light of the principle that the Act provides a cause of action where the common law runs dry, we conclude that, even assuming Plaintiffs must show that Quicken Loans had a duty to disclose, the duty arises from the Act itself. In other words, the Act provides an avenue for seeking relief when a lender conceals a fact despite having an ethical obligation to disclose it, such that the failure to disclose the fact was unconscionable.

41

at 280, and Quicken Loans may have desired to obtain higher loan values to improve its position when reselling those loans, *see Brown*, 737 S.E.2d at 652 n.25; *cf. McCauley v. Home Loan Inv. Bank, F.S.B.*, 710 F.3d 551, 559 n.5 (4th Cir. 2013). But an inflated home value posed risks to both parties, too. *See McFarland*, 810 F.3d at 280–81. Amidst these various dangers and incentives—and stepping into the middle of a transaction between parties with unequal bargaining power—the impartial appraiser was the only trained professional available to objectively evaluate the value of the home. Thus, conduct designed to influence the appraisal process is not causally attenuated from the class members' decisions to enter the loans. Put another way, the appraisal process is sufficiently central to the refinancing agreement that any conduct designed to affect the appraisal process necessarily contributed to the Plaintiffs' conclusions to enter the loans. And where, as here, that conduct was unconscionable, it is actionable under the Act.

The evidence shows that appraisers were made aware of target values and pressured to reevaluate their appraisals if they fell below those amounts. Appraisers, thus, had in mind the target value when they assessed or reassessed Plaintiffs' home values and, at least sometimes, adjusted their appraisals in response—even if they did so only subconsciously. And as those appraisals were central components in determining the terms of each loan, there is no genuine dispute that they—and, more importantly, their guise of impartiality— contributed to Plaintiffs' decisions to enter those loans. Moreover, because Defendants'

42

behavior was unethical, it was unconscionable under the Act. Therefore, Plaintiffs have established their claim for unconscionable inducement.[27]

E.

We close our discussion of unconscionable inducement by emphasizing the circumscribed nature of our holding—a limitation that is necessary when we are wading somewhat into uncharted waters of state law, albeit with significant guidance from West Virginia's highest court. *See id.* at 284.

Defendants' challenged actions were of a particularly questionable character and pertained to an aspect of the loan process that is particularly essential. The loans in question were secured by the collateral of the borrowers' homes—by far the most significant investment, in terms of sheer value, that most Americans will make in their lifetimes, but also property that is necessary as shelter and, for many, carries great personal significance as a home. We think it plain that reasonable borrowers would not risk their significant investments, shelters, and homes without compelling reason. Again, we emphasize that there is no evidence in the record suggesting that, when the class members estimated their home values, they knew that those values would be passed on to appraisers or used to pressure appraisers to increase appraisal values. Indeed, it is reasonable to suppose that the borrowers each assumed that the appraisal provided an unbiased valuation of their homes on which they could rely as they planned their financial futures.

---

[27] Defendants do not challenge on appeal the statutory-damages award for Plaintiffs' unconscionable-inducement claim.

Yet Defendants did not respect this process. Instead, they flexed their power as the party arranging the appraisal in an attempt to influence the impartial third parties upon whose advice Plaintiffs appropriately relied. Plaintiffs thought they were playing a fair game of poker, albeit one where the Defendants were dealing the cards. Plaintiffs did not know that Defendants were also stacking the deck.

Our holding thus should not be interpreted to open the floodgates to a deluge of litigation challenging any possible means by which a lender could attempt to better position itself in a negotiation. Parties to agreements can, of course, take some measures to protect and further their interests without coming close to violating the Act. But where a lender induces a borrower to enter a loan through deceptive practices that relate to the heart of the loan-formation process, thereby compromising the integrity and fairness of that process, West Virginia law provides the borrower with a remedy. We decline to accept Defendants' invitation to ignore that legislative cure for their misbehavior. After all, "[i]t would be dispiriting beyond belief if courts defeated [a legislature's] obvious attempt to vindicate the public interest with interpretations that ignored the purpose, text, and structure of th[e] Act at the behest of those whose abusive practices the legislative branch had meant to curb." *Krakauer*, 925 F.3d at 663.

V.

Plaintiffs' final claim, against both Quicken Loans and TSI, was for conspiracy. Defendants' only argument on appeal related to that claim is that "[t]he district court's summary-judgment decision on Plaintiffs' civil-conspiracy claim . . . was derivative of its ruling on the [unconscionable-inducement] count." Opening Br. at 31. And since

44

Defendants believe reversal to be appropriate for the statutory claim, they argue the same for the conspiracy claim. Because we affirm the district court's decision to grant summary judgment to Plaintiffs on their statutory claim, this argument fails. And by not making any other arguments regarding this claim, Defendants have waived any such arguments on appeal. *See Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017). Accordingly, we also affirm the district court's grant of summary judgment to Plaintiffs on the conspiracy claim.

## VI.

For the foregoing reasons, we affirm the district court's decisions to grant class certification, grant summary judgment to Plaintiffs on their conspiracy and unconscionable-inducement claims, and award statutory damages. However, we vacate the district court's grant of summary judgment to Plaintiffs on their breach-of-contract claim and the related damages award, and we remand that claim for further proceedings consistent with this opinion.

*AFFIRMED IN PART, VACATED IN PART,*
*AND REMANDED.*

45

NIEMEYER, Circuit Judge, dissenting:

Phillip and Sara Alig and Daniel and Roxanne Shea refinanced the mortgages on their homes in 2007 and 2008, respectively, with loans from Quicken Loans Inc. to consolidate their debts and reduce their payments. In the standard application form that they signed to apply for the loans, they provided, among other things, an estimated value of their homes and the amount that they wished to borrow. To qualify the loans, Quicken Loans obtained appraisals from independent, professional appraisers, who were provided with the borrowers' home-value estimates. This was, at the time, a customary and accepted industry practice. While the Aligs and the Sheas provided their estimates unconditionally, indicating that the estimates could be used by Quicken Loans, its agents, and its servicers, they were not informed in particular that their estimates would be provided to the appraisers.

At the closings, the Aligs and Sheas received the borrowed money and, as they had agreed, paid for the costs of the appraisals — $260 in the Aligs' case and $430 in the Sheas'. As planned, the two couples then consolidated their debts to their financial benefit. There is no dispute that they received exactly what they had bargained for and that they were highly satisfied with the transactions.

After industry standards changed in 2009 so that lenders could no longer provide appraisers with borrowers' home-value estimates and years after their loans closed, the Aligs and Sheas commenced this class action against Quicken Loans. They alleged that the practice that Quicken Loans followed in 2007 and 2008 of providing appraisers with borrowers' home-value estimates without their knowledge was "unconscionable conduct"

46

that "induced" their loan transactions, in violation of the West Virginia Consumer Credit and Protection Act, W. Va. Code § 46A-2-121(a)(1) (making unenforceable consumer loans that are "induced by unconscionable conduct"). They also claimed that the practice constituted a breach of contract. With their action, the Aligs and Sheas sought to represent a class of other West Virginia residents who had also refinanced their mortgages with Quicken Loans before 2009 — a class involving nearly 3,000 loans. The district court certified the class, agreed with the Aligs and Sheas on both claims, and entered summary judgment against Quicken Loans for over $10 million. And in a startling opinion, the majority now largely affirms the district court's conclusion.

To impose liability on Quicken Loans for what was an industry-wide practice to provide relevant information to appraisers and that harmed the Aligs and Sheas *not one iota* is fundamentally unjust; it is, as we have previously observed, "not the borrower but the bank that typically is disadvantaged by an under-collateralized loan." *McFarland v. Wells Fargo Bank, N.A.*, 810 F.3d 273, 280 (4th Cir. 2016). Imposing liability here thus lacks common sense. Moreover, it stands statutory liability on its head.

West Virginia law creates lender liability for "unconscionable conduct" that "induces" the borrower to enter into a consumer loan transaction. Yet here, there is no factual or legal basis to call the challenged practice "unconscionable," a term that West Virginia courts have equated with fraudulent conduct. Nor is there any evidence that the borrowers were "induced by" the practice to enter into the loan transactions. By their own allegations, the Aligs and Sheas were unaware of the practice, and there is simply no evidence that if they had been made aware of it, they would not have proceeded with the

47

transactions on the same terms. They were interested in receiving a loan in the amount they had applied for and at the cost that was fully disclosed to them for the purpose of consolidating their debts.

In affirming a $10-million liability in these circumstances, the majority opinion stands totally out of step with the interests of both parties to the transactions. This is an unjust punishment indeed for a company that followed a practice that was both customary and legal and only later modified to avoid potentially influencing appraisers. And regardless of the change in 2009, there is no evidence that the appraisers on these loans were influenced by the borrowers' estimates or that any kind of fraud was committed.

I conclude that the practice followed in 2007 and 2008 of providing appraisers with the borrowers' estimates of home value without disclosing that practice to the borrowers *was plainly not unconscionable conduct* under virtually any understanding of the term and certainly not under the standard imposed by West Virginia Code § 46A-2-121. There was nothing unscrupulous or akin to fraud involved in the transactions. The practice that the Aligs and Sheas challenge was related only to lenders' dealings with appraisers who were retained to protect *the lenders* from undercollateralized loans; the practice was accepted by the industry at the time; the practice did not affect — nor would it have affected if disclosed — the Aligs and Sheas' conduct in pursuing the loans; and the practice caused the Aligs and Sheas no damage.

I also conclude that the Aligs and Sheas *were not induced* by the practice to enter into the loan transactions. They did not know of it, and there is simply no evidence that had the practice been disclosed to them, they would have proceeded any differently.

48

I would reverse and remand with instructions to enter judgment for Quicken Loans and its agent, Title Source, Inc.

I

The practices followed by borrowers and lenders in refinancing home mortgages were and are well understood, and they are governed by numerous regulations designed to serve both borrowers and lenders. The evidence in this case showed that Quicken Loans followed the accepted practices both before 2009 and after, and the Aligs and Sheas have pointed to no deviation from them, much less deceit.

A refinancing transaction typically begins with the prospective borrower filling out a Uniform Residential Loan Application (Fannie Mae Form 1003), which requires the lender to provide, among other things, information about their income and debts, their assets, and the amount and basic terms of the loan being sought. In one portion of the application, the borrowers are specifically requested to fill in a schedule of real estate owned, providing the real estate's "present market value," as well as the mortgages and liens on it. The form expressly authorizes use of the application's information by the lender, its "agents," and its "servicers," providing that the borrower "agrees and acknowledges that . . . *the Lender and its agents, . . . [and] servicers . . .* may continuously rely on the information contained in the application." Lenders use the application's information to identify loan programs for which the borrowers would be eligible, to qualify the borrowers for loans with a demonstration of adequate income and collateral, to obtain

49

credit information regarding the borrowers, and to retain appraisers to appraise the borrowers' homes.

Before 2009, lenders commonly provided the borrowers' home-value estimates to appraisers who were engaged to provide appraisals in connection with mortgage refinancings. The testimony in the record shows that this "was a common and acceptable practice for mortgage lenders." The information helped appraisers determine whether they had the right licensure to complete the appraisal, decide whether to accept the assignment, and determine what fee to charge for the appraisal. And the practice was considered appropriate under the Uniform Standards of Professional Appraisal Practice ("USPAP") issued by the Appraisal Standards Board. Indeed, under guidance published by the Board, appraisers were expressly allowed to receive borrowers' estimates. The Board recognized that the mere receipt of such information was not inconsistent with the appraisers' obligation to perform their appraisals with "impartiality, objectivity, and independence." But an appraiser was not authorized to accept an engagement that was conditioned on reporting a predetermined opinion of value.

Appraisals were (and continue to be) generally reported on a Uniform Residential Appraisal Report (Fannie Mae Form 1004). When submitting appraisals on that form, the appraiser certifies that he or she performed the appraisal "in accordance with the requirements of the" USPAP.

Quicken Loans followed these customary procedures during the pre-2009 period, using the Fannie Mae forms. It would upload information about a prospective borrower, including the borrower's estimate of home value, into a computer system that would then

50

transmit the information to Title Source, Inc., an affiliated appraisal management company that obtained appraisals from independent appraisers and provided other loan settlement services both to Quicken Loans and other mortgage lenders. Title Source used the information it received from Quicken Loans to generate an appraisal request form, which included the "Applicant's Estimated Value." The form was sent through an automated system to professional appraisers and appraisal companies in the area where the property was located. The appraisers in this case then reported their appraisals on Fannie Mae Form 1004.

In 2009, with the issuance of the Home Valuation Code of Conduct, a new rule went into effect that, among other things, prohibited both lenders and appraisal management companies from providing any estimated home values to appraisers in connection with refinance transactions, including the borrowers' own estimates. With the issuance of this new rule, Quicken Loans and Title Source stopped including borrowers' estimated home values on appraisal request forms. But the refinancings by the Aligs and the Sheas were completed under the former practice, before the new rule went into effect.

Phillip and Sara Alig purchased their home in Wheeling, West Virginia, in 2003 for $105,000, financing their purchase with a mortgage. In December 2007, they sought to refinance their mortgage and consolidate their debts with a loan from Quicken Loans. On the Uniform Residential Loan Application form, they indicated that the "present market value" of their home was $129,000, and this estimate was thereafter included on the appraisal request form that Title Source sent to a local appraiser who was retained to determine what the fair market value of the Aligs' home was. The appraiser at first

51

determined that value to be $122,500. Title Source asked the appraiser, however, to "revisit [the] appraisal for [a] possible value increase to $125,500" based on an "adjusted sales price of comps." The appraiser agreed that, in view of "the comps" (which included nearby home sales of $124,000 and $132,000), it was appropriate to increase the appraisal to $125,500. The appraiser submitted his report on the uniform form (Fannie Mae Form 1004), certifying that he had conducted the appraisal in accordance with the USPAP standards and that his compensation was not conditioned on his reporting "a predetermined specific value." In addition, he testified that receiving homeowners' estimated values did not influence his appraisals in any way. Quicken Loans thereafter agreed to lend the Aligs $112,950 at a fixed interest rate of 6.25%, and at closing, which took place in December 2007, the Aligs used the proceeds to pay off a car loan and credit card debt, saving them $480 per month for almost a year thereafter. Included in the closing costs that the Aligs paid with the refinancing was $260 for the cost of the appraisal.

Similarly, Daniel and Roxanne Shea purchased their home in Wheeling, West Virginia, in 2006 for $149,350, financing their purchase with two mortgage loans from Quicken Loans. In June 2008, they sought to refinance their mortgages with a loan from Quicken Loans to consolidate their debts. On the Uniform Residential Loan Application form, they indicated that the "present market value" of their home was $170,000, and this information was included on the appraisal request form that Title Source sent to a local appraiser. That appraiser appraised the Sheas' property at $158,000, using Fannie Mae Form 1004. He testified later that the "Applicant's Estimated Value" was nothing more than what the borrowers assumed their house was worth and so was "irrelevant" to his task

52

of determining market value using "comparables." He also stated that if a potential client had attempted to condition his payment on his assessing a house to be worth a certain minimum value, he would have refused to do the job. Quicken Loans agreed to lend the Sheas $155,548 at a fixed interest rate of 6.625%, which consolidated their previous mortgage loans. One of the consolidated loans had a balloon-interest provision and the other had an interest rate of 12.4%. As part of the closing costs, the Sheas paid $430 for the cost of the appraisal.

There is no evidence that either the Aligs or the Sheas were dissatisfied with their refinancing transactions with Quicken Loans. Indeed, they rated their experience at the highest level ("excellent" or 5 out of 5), and both couples improved their cash-flow circumstances. Nonetheless, after the 2009 rule change by which lenders were no longer permitted to provide the borrowers' home-value estimates to appraisers, the Aligs and Sheas decided to sue Quicken Loans and Title Source for the practice followed in their pre-2009 refinancing transactions. In their complaint, they alleged that Quicken Loans had "sought to influence appraisers" by providing them with "suggested or estimated values on appraisal request forms." They also stated that Quicken Loans had not informed them of this practice and claimed that, by so "compromising the integrity of the appraisal process," the practice had "rendered [their] appraisals unreliable and worthless." The Aligs and Sheas did not allege, however, that they would not have refinanced their home mortgages with Quicken Loans on the same terms had they known that their home-value estimates had been sent to the appraisers. But, using the statutory language, they alleged in their complaint that their loans were "induced by unconscionable conduct," in violation of West

53

Virginia Code § 46A-2-121(a)(1), which is part of the West Virginia Consumer Credit and Protection Act. They also alleged that by "providing value estimates to appraisers" without disclosing the practice to them, Quicken Loans breached its contractual obligation to obtain "a fair and unbiased appraisal." Finally, they alleged that Quicken Loans and Title Source engaged in an unlawful civil conspiracy that rendered Title Source equally liable for the unconscionable inducement and breach of contract claims alleged.

Following discovery, the plaintiffs filed a motion to certify their action as a class action on behalf of "[a]ll West Virginia citizens who refinanced mortgage loans with Quicken, and for whom Quicken obtained appraisals through an appraisal request form that included an estimate of value of the subject property." There were 2,769 such loans.

Shortly thereafter, the parties filed cross-motions for summary judgment, and the district court, by memorandum opinion and order dated June 2, 2016, both certified the proposed class and granted summary judgment to the plaintiffs on the three claims.

The court found as a matter of law "that the act of sending an estimated . . . value to an appraiser in connection with a real estate mortgage loan refinancing" without disclosing the practice to borrowers was "unconscionable conduct" within the meaning of § 46A-2-121. It reasoned that the "estimated values were used by Quicken as a means of communicating targets to its appraisers." The court also concluded as a matter of law that the unconscionable conduct induced the plaintiffs' loan agreements. Noting that "[a] violation exists when 'the agreement or transaction . . . [has been] induced by unconscionable conduct,'" the court explained its view that the focus of the statute "is plainly on the lender or creditor's conduct," rather than "the consumer's state of mind."

54

On the contract claim, the district court explained that the plaintiffs and Quicken Loans had executed a contract at the beginning of the loan process, entitled "Interest Rate Disclosure and Deposit Agreement," which provided that immediately upon receiving the borrowers' loan application and deposit, Quicken Loans would begin processing the application by, among other things, obtaining an appraisal. That agreement also noted that while Quicken Loans aimed to have the borrowers' application approved by the anticipated closing date, it could not be responsible for delays in loan approval due to, among other things, "the untimely receipt of an acceptable appraisal." The court concluded that this agreement was intended to "facilitate the loan application process by having the lender, Quicken, obtain an 'acceptable' appraisal, which, at a minimum, would require Quicken to deal honestly with its borrowers and in keeping with the prevailing standards of reasonableness." But because "providing a target figure to an appraiser is a practice that is universally condemned and serves no legitimate purpose," the court concluded that Quicken Loans had breached its obligation to obtain an "acceptable" appraisal and had violated its "duty to deal honestly" by "withholding knowledge of the true nature of the appraisal."

On the civil conspiracy claim, the court held that Quicken Loans and Title Source "consistently acted in concert to accomplish their unlawful purposes," such that they were jointly liable for the "scheme."

In a later order, the court awarded (1) statutory damages of $3,500 per loan for the unconscionable inducement claim, for a total of $9,691,500, and (2) approximately $969,000 for the breach of contract claim, which represented the aggregate amount of fees

55

paid for appraisals that "were rendered worthless by Quicken's breach."   The total judgment thus exceeded $10.6 million.

From the final judgment dated December 14, 2018, Quicken Loans and Title Source (hereafter collectively "Quicken Loans") filed this appeal.

## II

On the statutory claim, the district court held that Quicken Loans' practice of obtaining appraisals through appraisal request forms that included the borrowers' estimate of their properties' value without specifically disclosing that practice to the borrowers constituted "unconscionable inducement under W. Va. Code § 46A-2-121."   Quicken Loans contends, however, that the court's ruling was doubly flawed because (1) the plaintiffs "offered no evidence of inducement" and (2) Quicken Loans "did nothing unconscionable."

Quicken Loans' argument thus directs our focus to the meaning of two terms — "induce" and "unconscionable" — as they are used in imposing liability when a consumer loan transaction is "*induced by unconscionable* conduct." W. Va. Code § 46A-2-121(a)(1) (emphasis added).  I start with the term "induce."

## A

The relevant portion of the West Virginia Consumer Credit and Protection Act provides that "[w]ith respect to a transaction which is or gives rise to a . . . consumer loan, if the court as a matter of law finds . . . [t]he agreement or transaction . . . to have been

*induced* by unconscionable conduct . . . , the court may refuse to enforce the agreement." W. Va. Code § 46A-2-121(a)(1) (emphasis added).

Beginning with the text, it is clear that to have an agreement "induced by" unconscionable conduct requires that the conduct of one party have contributed to the agreement's formation in the sense that it was material, or would have been material, to the other party's decision to enter into the agreement. Thus, if one party engaged in "unconscionable conduct" at some point in the process of the agreement's formation, but the other party would have agreed to the same transaction regardless, it cannot fairly be said that the unconscionable conduct *induced* the agreement. This much is clear from the text alone because "induce" and "inducement" have well recognized legal meanings, as even the majority acknowledges. *See ante* at 32. For instance, Black's Law Dictionary's primary definition of inducement is "[t]he act or process of *enticing or persuading* another person to take a certain course of action." *Black's Law Dictionary* 894 (10th ed. 2014) (emphasis added); *cf. Mountain State College v. Holsinger*, 742 S.E.2d 94, 100 (W. Va. 2013) (relying on the definition of "consumer credit sale" in Black's Law Dictionary when interpreting the Consumer Credit and Protection Act). In addition to this general definition, Black's Law Dictionary also recognizes several specialized meanings of "inducement." A contract's "inducement," for example, is the "benefit or advantage that *causes* a promisor to enter into a contract." *Black's Law Dictionary*, *supra*, at 894 (emphasis added). And even more telling, Black's Law Dictionary defines "[f]raud in the inducement" as "[f]raud occurring when *a misrepresentation leads another to enter* into a transaction with a false impression of the risks, duties, or obligations involved." *Id.* at 776 (emphasis added).

57

West Virginia courts have long given the word "induce" this same meaning when applying the State's tort law. *See, e.g.*, *Traders Bank v. Dils*, 704 S.E.2d 691, 696 (W. Va. 2010) ("The critical element of a fraudulent inducement claim is an oral promise that is used as *an improper enticement* to the consummation of another agreement. The fact that the agreement is reduced to writing . . . does not negate the occurrence of a precedent oral promise that was *the motivating factor for the making of such agreement*" (emphasis added)). Although the fraudulent representation or concealment need not be "the *sole* consideration or inducement moving the plaintiff," it must at least have "contributed to the formation of the conclusion *in [the plaintiff's] mind*" for an inducement to have occurred. *Horton v. Tyree*, 139 S.E. 737, 739 (W. Va. 1927) (second emphasis added).

The West Virginia Supreme Court of Appeals' decision in *Quicken Loans, Inc. v. Brown*, 737 S.E.2d 640 (W. Va. 2012), serves as a telling example of how that court understands the meaning of "induce" — specifically, the centrality of the effect of the alleged misconduct *on the individual plaintiff's decisionmaking process*. In *Brown*, the court held that the plaintiff had proved that the lender "fraudulently induced [her] to enter into [a] loan" to refinance her home mortgage by "failing to disclose [an] enormous balloon payment." *Id.* at 652. It explained that "[i]t [was] undisputed that the reason [the plaintiff] sought to refinance was to consolidate her debt and to reduce her monthly payments — in short, to save money." *Id.* at 654. Thus, "[c]oncealing such an enormous balloon payment from [the plaintiff] *was designed to mislead her and to induce* her into entering into the loan and, in fact, that is precisely what occurred." *Id.* (emphasis added). Similarly, the court concluded that a fraudulent misrepresentation by the lender "that it would refinance

58

the loan in three to four months was clearly material because, *absent that promise*, [the plaintiff] would not have otherwise entered into the loan." *Id.* at 655 (emphasis added). On the flip side, however, the court held that the plaintiff had failed to prove that the lender's misrepresentation of a $2,100 fee as being paid to secure a lower interest rate had induced her to enter into the refinancing, agreeing there was insufficient evidence "that if the loan discount had been accurately described on the closing documents, [the plaintiff] would not have consummated the loan." *Id.* at 656.

There is no indication that the West Virginia Supreme Court of Appeals would understand "induced by" in § 46A-2-121 to have any meaning other than this settled one. *See Napier v. Bd. of Educ. of Cnty. of Mingo*, 591 S.E.2d 106, 110 (W. Va. 2003) ("When presented with a matter of statutory interpretation, this Court typically first looks to the precise language employed by the Legislature in order to determine the meaning of the controverted statute. . . . If the text, given its plain meaning, answers the interpretive question, the language must prevail and further inquiry is foreclosed" (cleaned up)). To the contrary, in *Brown* itself, the court signaled the similarity between a statutory unconscionable inducement claim under § 46A-2-121 and a common law fraudulent inducement claim, reasoning that because the plaintiff had established the latter, she had also established the former. *Brown*, 737 S.E.2d at 658.

Moreover, in *Brown*, the court also explained that when interpreting § 46A-2-121, it "found the drafters' comments to the [Uniform] Consumer Credit Code ["UCCC"] to be highly instructive," as "the unconscionability provisions of [the UCCC] are identical to West Virginia Code § 46A-2-121(a) and (b)." 737 S.E.2d at 656–57. Significantly, an

59

early version of the UCCC only provided for nonenforcement of an agreement respecting a consumer credit sale, consumer lease, or consumer loan if the agreement was "unconscionable at the time it was made." Unif. Consumer Credit Code 1968 § 5.108(1). In the 1974 version, however, the provision was expanded to include unconscionable inducement. *See* Unif. Consumer Credit Code 1974 § 5.108(1). And in explaining this amendment, the UCCC's accompanying comments stated:

> Subsection[] (1) . . . [is] derived in significant part from UCC Section 2-302. Subsection (1), as does UCC Section 2-302, provides that a court can refuse to enforce or can adjust an agreement or part of an agreement that was unconscionable on its face at the time it was made. However, many agreements are not in and of themselves unconscionable according to their terms, *but they would never have been entered into by a consumer if unconscionable means had not been employed to induce the consumer to agree to the contract.* It would be a frustration of the policy against unconscionable contracts for a creditor to be able to utilize unconscionable acts or practices to obtain an agreement. Consequently subsection (1) also gives to the court the power to refuse to enforce an agreement if it finds as a matter of law that it was induced by unconscionable conduct.

Unif. Consumer Credit Code 1974 § 5.108 cmt. 1 (emphasis added). These comments — which, again, the West Virginia Supreme Court of Appeals has specifically recognized as being "highly instructive" in interpreting § 46A-2-121, *see Brown*, 737 S.E.2d at 657 — only further confirm that a contract is induced by unconscionable conduct when such conduct is used *to help secure the consumer's agreement* to the contract. Indeed, relying on the UCCC comments quoted above, we recognized as much in *McFarland*, where we stated that § 46A-2-121 supports "two distinct causes of action when it comes to consumer loans: one for unconscionability in the loan terms themselves, and one for unconscionable conduct *that causes a party to enter into a loan*." 810 F.3d at 285 (emphasis added).

60

Tellingly, the Aligs and Sheas *have not even attempted* to argue that they presented sufficient evidence to prove that the allegedly unconscionable conduct at issue here induced them to refinance their mortgages with Quicken Loans. Rather, they stake their position on the proposition that all that is required to establish a lender's liability under § 46A-2-121 is simply that unconscionable conduct was *part of the process leading to the agreement's creation*, regardless of whether it had any effect on "the formation of the conclusion in the plaintiff's mind." *Brown*, 737 S.E.2d at 654. Their posited interpretation, however, is at odds with not only the statute's text and case law construing "induce," but also the provision's purpose of ensuring that consumers are protected when a lender has used "unconscionable acts or practices to obtain an agreement" from them, even if the terms of that agreement are not themselves unconscionable. Unif. Consumer Credit Code 1974 § 5.108 cmt. 1.

Here, the plaintiffs have simply failed to establish that their loan agreements were "induced by" Quicken Loans' failure to disclose that the home-value estimates that they themselves had provided had been included on the appraisal request forms. In other words, they failed to prove that Quicken Loans' lack of disclosure was a "motivating factor for [their] making of" the loan agreement, *Traders Bank*, 704 S.E.2d at 696; or that it "contributed to" their decision to enter into the loan, *Brown*, 737 S.E.2d at 654; or that it "cause[d] [them] to enter into [the] loan," *McFarland*, 810 F.3d at 285. This failure should have entitled Quicken Loans to judgment as a matter of law on the statutory claim.

To avoid the plaintiffs' obvious failure, the majority opinion manufactures an approach alien to West Virginia law. It reasons that even though "'inducement' implies

61

that the affirmative misrepresentation or active deceit in some way *caused* the plaintiff to enter the loan," *ante* at 32 (emphasis added), it can nonetheless find this element satisfied by "predict[ing] that the state Supreme Court would find that a plaintiff who proves unconscionable conduct in the form of concealment will recover unless the conduct was *sufficiently attenuated from or irrelevant to the loan's formation that it did not contribute to the formation of the plaintiff's decision to enter the loan,*" *id.* at 35–36 (emphasis added). Such a prediction is unprecedented and has no rational foundation. It fundamentally fails to take into account that to establish that the lender's concealment of something induced the plaintiff's agreement requires proof that the *disclosure* of that information would have changed their decision. *See Brown*, 737 S.E.2d at 655–56; *cf. White v. Wyeth*, 705 S.E.2d 828, 837 (W. Va. 2010).

Because the record contains no evidence that it would have made any difference to the Aligs or the Sheas to have learned that their estimates had been provided to the appraisers — the plaintiffs having indeed foresworn the need to make such a showing — I would vacate the district court's summary judgment on the statutory claim and remand with instructions to grant summary judgment to the defendants.

B

To prove a claim under § 46A-2-121, the Aligs and Sheas would not only have to prove inducement but also establish that the inclusion of their home-value estimates on the appraisal request forms without disclosure to them amounted to "unconscionable conduct" as a matter of law. W. Va. Code § 46A-2-121(a)(1). In asserting that they established that

62

element, they argue that providing appraisers with their estimates of home value "bias[ed] the result" of the appraisals, but that Quicken Loans had presented the appraisals to them as if they were "independent estimates." They characterize these posited facts as the "'equivalent to' an affirmative misrepresentation." Surprisingly, the majority opinion simply accepts the plaintiffs' argument.

The plaintiffs' elaboration of facts purporting to demonstrate unconscionable conduct, however, is sheer speculation. The record shows nothing malignant about the specific practice at issue here — a practice that was common in the lending industry and entirely consistent with the ethical standards for appraisers under the USPAP. Certainly, the record supports no claim that this conduct amounted to fraud. Yet, in interpreting § 46A-2-121(a)(1), the West Virginia Supreme Court of Appeals has expressly "equated" "conduct that is 'unconscionable' . . . with fraudulent conduct." *One Valley Bank of Oak Hill, Inc. v. Bolen*, 425 S.E.2d 829, 833 (W. Va. 1992); *see also Mountain State College*, 742 S.E.2d at 102 n.9 (same, quoting *One Valley Bank of Oak Hill*, 425 S.E.2d at 833).

The unvarnished facts of record show that the Aligs estimated the value of their home at $129,000 and that the appraiser, despite having knowledge of their estimate, gave an appraisal of $125,500, certifying that the appraisal represented his impartial, objective, and independent judgment based on comparable sales. Likewise, the Sheas estimated the value of their home at $170,000, and the appraiser, despite having knowledge of their estimate, gave an appraisal of $158,000, again certifying that the appraisal represented his impartial, objective, and independent judgment based on comparable sales. He testified affirmatively that his appraisal was not influenced by the Sheas' estimate and that if he

63

believed that he had been retained to satisfy their estimate, he would not have undertaken the engagement.

Testimony was also presented that the practice of providing the borrowers' estimates to appraisers served the legitimate purposes of helping price the appraisal project and assigning it to an appraiser with the right qualifications. And virtually every appraiser who testified said that the inclusion of the borrowers' home-value estimate on the order form engaging their services did not affect their appraisals. The Uniform Standards of Professional Appraisal Practice allowed the appraisers to receive a borrower's estimate so long as it was recognized that such estimate was only informational and "not a condition for [the] placement of [the] assignment."

It defies common sense to suppose that, had the Aligs and Sheas been told that the home-value estimates in their loan applications would be provided to the appraisers, they would have been outraged by the practice. Indeed, their loan applications suggest otherwise, as they agreed that Quicken Loans and its agents or servicers could rely on the information. It is quite telling that the Aligs and Sheas only challenged the practice several years later, after the adoption of the Home Valuation Code of Conduct, when regulators changed the rules in recognition of the practice's potential for pernicious systemic effects. But it certainly does not follow that Quicken Loans' adherence to the prior practice can — standing alone — be said to amount to conduct so "unconscionable" that it would permit a court to "refuse to enforce" the consumer's refinance loan under § 46A-2-121(a)(1). Its conduct was neither unscrupulous nor fraudulent, and disclosure of it would not have changed a thing.

64

The district court at least should have recognized that it was engaging in unsupported findings of fact that were rebutted by the evidence presented by Quicken Loans, thus precluding summary judgment. But based on the record before the court, it is apparent that, as a matter of law, the Aligs and Sheas have not shown that the practice that Quicken Loans followed in 2007 and 2008 in processing their refinancing loans was "unconscionable."

III

Finally, I would also vacate the district court's summary judgment in favor of the plaintiffs on their contract claim and remand with instructions to grant summary judgment to Quicken Loans.

The Aligs and the Sheas' breach of contract claim is based on the one-page Interest Rate Disclosure and Deposit Agreement that Quicken Loans entered into with prospective borrowers who were applying for loans. As relevant here, that document provided:

> Lender will begin processing your application (which may include ordering an appraisal, credit report, title commitment and other necessary items) immediately upon the submission of your application and deposit. . . .

> With your deposit . . . , you authorize Lender to begin processing your loan application and advance out-of-pocket expenses on your behalf. . . .

> If your application is approved: At the closing, Lender will credit the amount of your deposit on your closing statement toward the cost of your appraisal and credit report. Any additional money will be credited to other closing costs. If your application is denied or withdrawn for any reason: Lender will refund your deposit less the cost of your appraisal and/or credit report.

The agreement thus contemplated that, in the course of processing the prospective borrowers' mortgage loan applications, Quicken Loans would obtain an appraisal of the

65

subject property and that the borrower would pay for that appraisal. And in this case, Quicken Loans did, as agreed, obtain appraisals in connection with the Aligs and Sheas' refinancing transactions, and the Aligs and Sheas did, at closing, pay for those appraisals.

The Aligs and Sheas contend — as the district court ruled — that they did not get the benefit of this bargain. They maintain that, by operation of the implied covenant of good faith and fair dealing, Quicken Loans was obligated to obtain a fair, valid, and reasonable appraisal and that, because they were not told that their home-value estimates had been included on the appraisal order forms, they were "deprived of the reasonable, fair, and unbiased appraisals that they paid for." The majority agrees as to Quicken Loans' contractual obligation to the borrowers to obtain a fair, valid, and reasonable appraisal, although it remands the claim for further proceedings on whether *that* contract was breached and whether damages resulted.

Even accepting that the Interest Rate Disclosure and Deposit Agreement should be read as requiring Quicken Loans to obtain fair and unbiased appraisals, the mere provision of the borrower's estimated value to the appraiser could not categorically render each appraisal unfair and biased, so as to give rise to a breach of contract claim. Indeed, the evidence in this case showed that when completing their appraisal reports, each appraiser certified that he "performed [the] appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice," and this certification was consistent with the USPAP even when the appraiser received the "owner's estimate of value." It is an erroneous exercise of judicial hindsight to now conclude from the simple fact that Quicken Loans, like others in the industry, included borrowers' estimates on

66

appraisal request forms that the resulting certified appraisals were categorically and necessarily biased and unfair in breach of contract.

*     *     *

The judgment entered against Quicken Loans in this case is manifestly inconsistent with West Virginia law. As important, it is palpably unjust. A thoughtful change in industry practice must not be taken as an invitation to file such opportunistic, and plainly wanting, litigation.