**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 22-2289**

───────────────

PHILLIP ALIG; SARA J. ALIG; ROXANNE SHEA; DANIEL V. SHEA,

        Plaintiffs - Appellees,

    v.

ROCKET MORTGAGE, LLC, f/k/a Quicken Loans Inc.; AMROCK, LLC, f/k/a Title Source, Incorporated, d/b/a Title Source Inc. of West Virginia, Incorporated,

        Defendants - Appellants,

    and

DEWEY V. GUIDA; APPRAISALS UNLIMITED, INCORPORATED; RICHARD HYETT,

        Defendants.

───────────────

Appeal from the United States District Court for the Northern District of West Virginia, at Wheeling.  John Preston Bailey, District Judge.  (5:12-cv-00114-JPB-JPM; 5:12-cv-00115-JPB)

───────────────

Argued:  September 26, 2024              Decided:  January 23, 2025

───────────────

Before NIEMEYER, Circuit Judge, FLOYD, Senior Circuit Judge, and Kenneth D. BELL, United States District Judge for the Western District of North Carolina, sitting by designation.

───────────────

Affirmed in part, vacated in part, reversed in part, and remanded by published opinion. Judge Niemeyer wrote the opinion, in which Judge Bell joined.  Judge Floyd wrote a dissenting opinion.

————————

**ARGUED:**   William M. Jay, GOODWIN PROCTER LLP, Washington, D.C., for Appellants.  Deepak Gupta, GUPTA WESSLER PLLC, Washington, D.C., for Appellees. **ON BRIEF:**  Helgi C. Walker, Jesenka Mrdjenovic, Andrew G.I. Kilberg, Washington, D.C., Theodore J. Boutrous, Jr., GIBSON, DUNN & CRUTCHER LLP, Los Angeles, California; Thomas M. Hefferon, Brooks R. Brown, Jaime A. Santos, Keith Levenberg, Rohiniyurie Tashima, Washington, D.C., Edwina B. Clarke, GOODWIN PROCTER LLP, Boston, Massachusetts, for Appellants.  Jonathan R. Marshall, Charleston, West Virginia, Patricia M. Kipnis, BAILEY & GLASSER LLP, Cherry Hill, New Jersey; Gregory A. Beck, Linnet Davis-Stermitz, GUPTA WESSLER PLLC, Washington, D.C.; Jason E. Causey, BORDAS & BORDAS, PLLC, Wheeling, West Virginia, for Appellees.

2

NIEMEYER, Circuit Judge:

Phillip and Sara Alig and Daniel and Roxanne Shea commenced this action on behalf of themselves and purportedly on behalf of a class of similarly situated persons in West Virginia against Quicken Loans, Inc. (now Rocket Mortgage, LLC), and its affiliate, Title Source, Inc. (now Amrock, Inc.). They alleged that in refinancing their home mortgage loans, they paid for appraisals that turned out not to be "independent" because the defendants had transmitted to the appraisers the homeowners' estimates of their homes' value, which they had provided to Quicken Loans in their loan applications. Based on this, they claimed that the appraisals they paid for were "worthless." They asserted a statutory claim that their loans had been "induced by unconscionable conduct," in violation of West Virginia Code § 46A-2-121(a)(1), a common law breach of contract claim, and a conspiracy claim.

The district court entered an order certifying a class of "[a]ll West Virginia citizens who refinanced mortgage loans with Quicken, and for whom Quicken obtained appraisals through an appraisal request form that included an estimate of value of the subject property," which amounted to 2,769 loans. The court then granted summary judgment to the plaintiffs and class members and awarded them more than $10.6 million, consisting of statutory damages of $3,500 per loan for the unconscionable inducement claim and a refund of the fees they had paid for the appraisals for the breach of contract claim. The court also found that the plaintiffs had conclusively established a conspiracy between the defendants and therefore entered judgment against both of them.

3

On appeal, we affirmed the district court's certification of the class, rejecting the defendants' argument that "a significant number of the class members [were] uninjured and therefore lack[ed] standing." *Alig v. Quicken Loans Inc.*, 990 F.3d 782, 791 (4th Cir. 2021). We also affirmed the district court's summary judgment on the statutory and conspiracy claims but vacated and remanded the judgment on the breach of contract claim. *Id*. at 808.

The Supreme Court granted the defendants' petition for a writ of certiorari, vacated our judgment, and remanded the case to us "for further consideration in light of *TransUnion LLC v. Ramirez*, 594 U.S. [413] (2021)." *Rocket Mortg., LLC v. Alig*, 142 S. Ct. 748 (2022). In *TransUnion*, the Court reiterated its standing jurisprudence that "only those plaintiffs who have been concretely harmed by a defendant's statutory violation" have standing to sue in federal court and applied that principle to class actions, holding that "*every class member* must have Article III standing in order to recover individual damages." 594 U.S. at 427, 431 (cleaned up).

On return of the case to our court, we vacated the district court's judgment and remanded the case for further proceedings to allow the district court to "apply *TransUnion* to the facts of this case in the first instance." *Alig v. Rocket Mortg., LLC*, 52 F.4th 167, 168 (4th Cir. 2022) (per curiam).

On remand, the district court entered a judgment reinstating its original judgment and stating that *TransUnion* "does not impede the class's showing on standing." It explained that "[e]ach member of the class . . . paid . . . for *an independent appraisal that*

4

*they never received*" and thus suffered a concrete harm, as necessary for Article III standing. (Emphasis added).

Based on *TransUnion*, we conclude that the plaintiffs have not established that the class members, as borrowers, suffered a concrete harm as a result of the defendants' transmission to appraisers of their home-value estimates, and therefore we reverse the district court's judgment to the extent that it certified the class and awarded its members damages. Otherwise, we adopt and incorporate our earlier judgment on the merits of the individual plaintiffs' claims, *see Alig*, 990 F.3d at 808, and remand for further proceedings consistent with this opinion.

I

When homeowners seek to refinance a home mortgage loan, the transaction typically begins with the homeowners, as prospective borrowers, completing a Uniform Residential Loan Application (Fannie Mae Form 1003), which requires them to provide, among other things, information about their income, debts, and assets, as well as the amount and basic terms of the loan being sought. In one portion of the application, borrowers are specifically requested to provide the "present market value" of the real estate that they own, as well as the mortgages and liens on it. In signing the standard loan application form, prospective borrowers agree that the lender and its agents and servicers "may continuously rely on the information contained in the application."

Before 2009, lenders commonly provided the borrowers' home-value estimates to the appraisers engaged to provide appraisals in connection with refinancing transactions.

5

The information helped appraisers determine whether they had the right licensure to complete the appraisal, whether to accept the assignment, and what fee to charge for the appraisal. And the practice was considered appropriate under the Uniform Standards of Professional Appraisal Practice ("Uniform Appraisal Standards") issued by the Appraisal Standards Board. Indeed, under guidance published by the Board, appraisers were expressly allowed to receive borrowers' estimates. The Board recognized that the mere receipt of such information was not inconsistent with the appraisers' ethical obligation to perform their appraisals with "impartiality, objectivity, and independence." Moreover, during the relevant time and still today, appraisers generally reported their appraisals by completing a Uniform Residential Appraisal Report (Fannie Mae Form 1004), which requires the appraiser to certify that he or she performed the appraisal "in accordance with the requirements of the" Uniform Appraisal Standards.

Quicken Loans followed these customary procedures during the pre-2009 period, using the Fannie Mae forms. Generally, it uploaded information about the prospective borrowers, including the borrowers' estimate of home value, into a computer system that would then transmit the information to Title Source, Inc., an affiliated appraisal management company that obtained appraisals from independent appraisers and provided other loan settlement services both to Quicken Loans and other mortgage lenders. Title Source used the information it received from Quicken Loans to generate an appraisal request form, which included the "Applicant's Estimated Value." Title Source then sent the form through an automated system to nearby professional appraisers and appraisal

6

companies. Following the prevalent practice, the appraisers then reported their appraisals on Fannie Mae Form 1004.

In 2009, with the issuance of the Home Valuation Code of Conduct, a new rule went into effect that, among other things, prohibited both lenders and appraisal management companies from providing any estimated home values to appraisers in connection with refinancing transactions, including the borrowers' own estimates. With the issuance of this new rule, Quicken Loans and Title Source ceased including borrowers' estimated home values on appraisal request forms.

The refinancings by the Aligs and the Sheas, as well as all class members, were completed under the pre-2009 practice, before the 2009 rule went into effect.

The Aligs purchased their home in Wheeling, West Virginia, in 2003 for $105,000, financing their purchase with a loan secured by a mortgage on their home. In December 2007, they sought to refinance their mortgage and consolidate their debts with a loan from Quicken Loans. On their Uniform Residential Loan Application form, they indicated that the "present market value" of their home was $129,000, and this estimate was thereafter included on the appraisal request form that Title Source sent to the local appraiser who was retained to determine the fair market value of the Aligs' home. The appraiser at first determined that value to be $122,500. Title Source, however, asked the appraiser to "revisit [the] appraisal for [a] possible value increase to $125,500" based on an "adjusted sales price of comps." The appraiser agreed that, in view of "the comps" (which included nearby home sales of $124,000 and $132,000), it was appropriate to increase the appraisal to $125,500. The appraiser submitted an appraisal report (Fannie Mae Form 1004),

7

certifying that he had conducted the appraisal in accordance with the Uniform Appraisal Standards and that his compensation was not conditioned on his reporting "a predetermined specific value." In addition, he testified later that his receipt of homeowners' estimated values did not influence his appraisals in any way. Quicken Loans thereafter agreed to lend the Aligs $112,950 at a fixed interest rate of 6.25%, and when the loan closed in December 2007, the Aligs used the proceeds to pay off a car loan and credit card debt, saving them $480 per month for almost a year thereafter. Included in the closing costs that the Aligs paid with the refinancing was a charge of $260 for the cost of the appraisal.

Years later, an expert retained by the plaintiffs indicated that she would have appraised the Aligs' home in December 2007 as being worth $99,500, and another expert retained by the plaintiffs estimated that the home's value in 2007 was $105,000, *i.e.*, the price that the Aligs had paid for the home in 2003.

The Sheas purchased their home in Wheeling, West Virginia, in 2006 for $149,350, financing the purchase with two loans from Quicken Loans secured by mortgages on their home. In June 2008, they sought to refinance their mortgages with a loan from Quicken Loans to consolidate their debts. During the application process, the Sheas estimated the value of their home to be $175,000, and this information was included on the appraisal request form that Title Source sent to a local appraiser. That appraiser appraised the Sheas' home at $158,000, using Fannie Mae Form 1004. He testified later that the "Applicant's Estimated Value" was nothing more than what the borrowers assumed their house was worth and thus was "irrelevant" to his task of determining market value using "comparables." He also stated that if a potential client had attempted to condition his

8

payment on his assessing a house to be worth a certain minimum value, he would have refused the job. Quicken Loans agreed to lend the Sheas $155,548 at a fixed interest rate of 6.625%, which consolidated their previous mortgage loans. One of the mortgage loans that the Sheas refinanced had a balloon-interest provision and the other had an interest rate of 12.4%. As part of the closing costs, the Sheas paid $430 for the cost of the appraisal.

An expert retained years later by the plaintiffs indicated that she would have appraised the Sheas' home in July 2008 as being worth $135,000 — *i.e.*, $14,350 less than the Sheas had paid to purchase the home in 2006 and $23,000 less than the 2008 appraisal. The Sheas sold their home in 2015 for $165,000, thus receiving nearly $10,000 more than they had borrowed when they refinanced their mortgage loans in 2008.

There is no evidence that either the Aligs or the Sheas were dissatisfied at the time with either the substance or the procedure of their refinancing transactions with Quicken Loans. To the contrary, they rated their experience at the highest level ("excellent," or 5 out of 5), and both couples improved their cash flow.

Nonetheless, after the 2009 rule change, the Aligs and Sheas commenced this class action against Quicken Loans and Title Source for, among other things, having included their home-value estimates on the forms used to hire the appraisers who appraised their homes in connection with their pre-2009 refinancing transactions. In their complaint, they alleged that Quicken Loans had "sought to influence appraisers" by providing them with "suggested or estimated values on appraisal request forms." They also noted that Quicken Loans had not informed them of this practice and claimed that, by so "compromising the integrity of the appraisal process," the practice had "rendered [their] appraisals unreliable

9

and worthless." Their complaint included several claims, only three of which are relevant here. *First*, they alleged that their loans had been "induced by unconscionable conduct," in violation of West Virginia Code § 46A-2-121(a)(1), which is part of the West Virginia Consumer Credit and Protection Act. *Second*, they alleged that "by providing value estimates to appraisers" without disclosing the practice to them, Quicken Loans had breached its contractual obligation to obtain "a fair and unbiased appraisal." And *third*, they alleged that Quicken Loans and Title Source had engaged in an unlawful civil conspiracy that rendered Title Source equally liable for the unconscionable inducement and breach of contract claims alleged against Quicken Loans. They purported to represent a class of all other West Virginia citizens similarly situated.

Following discovery, the Aligs and Sheas filed a motion to certify a class of "[a]ll West Virginia citizens who refinanced mortgage loans with Quicken, and for whom Quicken obtained appraisals through an appraisal request form that included an estimate of value of the subject property." There turned out to be 2,769 such loans. The parties also filed cross-motions for summary judgment on the merits of the plaintiffs' claims. By a memorandum opinion and order dated June 2, 2016, the district court certified the proposed class and granted the named plaintiffs and class members summary judgment on all three claims. In the ultimate judgment on these claims, dated December 14, 2018, the court awarded the Aligs, the Sheas, and the class members (1) statutory damages of $3,500 per loan for the unconscionable inducement claim, for a total of $9,691,500, and (2) $968,702.95 for the breach of contract claim, which represented the aggregate amount

of appraisal fees paid by the plaintiffs. The court thus entered a final judgment awarding the named plaintiffs and the class more than $10.66 million.

On appeal, a divided panel of this court affirmed the district court's decision to certify the class, rejecting, among other challenges, the defendants' argument that "a significant number of the class members [were] uninjured and therefore lack[ed] standing." *Alig*, 990 F.3d at 791. We reasoned that all of the class members had paid "for *independent* appraisals" but instead "received appraisals that were tainted when Defendants exposed the appraisers to the borrowers' estimates of value and pressured them to reach those values." *Id*. at 791–92 (emphasis added). We concluded that the "financial harm" involved in paying for something that was different from what was received was "a classic and paradigmatic form of injury in fact," even if the plaintiffs financially "benefited from obtaining the loans." *Id*. at 792 (cleaned up).

We also affirmed the district court's holding on the merits of the plaintiffs' statutory claim for unconscionable inducement, reasoning that the defendants' practice of including the prospective borrowers' estimates on the appraisal request forms without disclosing the practice to the borrowers was unconscionable and that all of the borrowers' loans were necessarily induced by this unconscionable conduct because "the appraisal process [was] sufficiently central to the refinancing agreement that any conduct designed to affect the appraisal process necessarily contributed to the Plaintiffs' conclusions to enter the loans." *Alig*, 990 F.3d at 806. And we affirmed the district court's judgment on the conspiracy claim, holding Title Source liable for the statutory violations as well.

11

Finally, on the plaintiffs' breach of contract claim, we vacated the district court's grant of summary judgment, concluding that, while "a contract was formed between each class member and Quicken Loans" under which "Quicken Loans was obligated to 'obtain a fair, valid and reasonable appraisal of the property,'" a remand was necessary to allow the district court to consider whether "Quicken Loans breached its contracts with the class members" and whether "the class members suffered damages as a result." *Alig*, 990 F.3d at 797–98. "In particular," we recognized that "the district court will need to address Defendants' contention that there were no damages suffered by those class members whose appraisals would have been the same whether or not the appraisers were aware of the borrowers' estimates of value — which one might expect, for example, if a borrower's estimate of value was accurate." *Id*. at 796; *see also id*. at 803 n.22 (noting that, based on the record, "we cannot evaluate whether the appraisals for most class members were inflated").

Three months after we published our *Alig* decision, the Supreme Court issued its decision in *TransUnion*, which applied "the Article III requirement that the plaintiff's injury in fact be concrete" to every member of the class in a class-action case. 594 U.S. at 424 (cleaned up). Subsequently, the Court also granted the defendants' petition for a writ of certiorari in this case, vacated our judgment, and remanded the case to us "for further consideration in light of *TransUnion*." *Rocket Mortg.*, 142 S. Ct. at 748.

After receiving supplemental briefing and hearing argument on remand from the Supreme Court, we issued an order dated October 28, 2022, that vacated the district court's judgment and remanded the case to the district court to "apply *TransUnion* to the facts of

this case in the first instance." *Alig*, 52 F.4th at 168. In doing so, we observed that "following *TransUnion*, it is clear that, to recover damages from Quicken Loans, *every class member* must have Article III standing for each claim that they press, requiring proof that they suffered concrete harm from the challenged conduct." *Id.* (cleaned up).

Several weeks later, the district court issued an order dated November 28, 2022, concluding that "nothing in *TransUnion* changes the findings of the majority of the Fourth Circuit panel." The district court explained, quoting our vacated opinion,

> Plaintiffs paid an average of $350 for independent appraisals that . . . they never received. Instead, they received appraisals that were tainted when Defendants exposed the appraisers to the borrowers' estimates of value and pressured them to reach those values.

(Quoting *Alig*, 990 F.3d at 791–92). The court advised that "[t]he Fourth Circuit panel should therefore reissue its prior opinion, with the added clarification that nothing in *TransUnion* alters [the] settled basis for Article III standing" on which our court had previously relied. Then, on December 12, 2022, the district court entered a judgment that incorporated its *TransUnion* ruling and "reinstate[d] its judgment of December 14, 2018" in its entirety. This appeal followed.

## II

The Supreme Court vacated our judgment reported at 990 F.3d 782 and remanded the case to us for further consideration in light of its decision in *TransUnion*. *See Rocket Mortg.*, 142 S. Ct. at 748. On remand, we vacated the district court's judgment of December 14, 2018, and remanded for it to consider *TransUnion*'s application to this case in the first instance. The district court has now concluded that "nothing in *TransUnion*"

13

undermines the ability of the class members in this action to establish standing because each and every one of them paid for something "that they never received" — namely, "an independent appraisal." It reinstated its original judgment of December 14, 2018, which included the certification of the class. The issue we address therefore is whether this portion of the district court's judgment complies with *TransUnion*.

*TransUnion* addressed "the Article III requirement that the plaintiff's injury in fact be concrete" in the context of a class action. 594 U.S. at 424 (cleaned up). The named plaintiff in that case brought a class action, alleging that TransUnion, a credit reporting agency, had violated the Fair Credit Reporting Act by failing to use reasonable procedures before placing a misleading alert in his credit file that labeled him as a potential terrorist, drug trafficker, or serious criminal. *Id.* at 419–21. He also asserted two claims based on TransUnion's having sent him two mailings that did not comply with certain formatting requirements imposed by the statute. *Id.* at 421. The district court certified a class of more than 8,000 people who had the same misleading alert added to their credit files and who had also received similar mailings during a certain time period. A jury then awarded each class member statutory and punitive damages, and the judgment was largely affirmed by the Ninth Circuit. *Id.* at 422. The Supreme Court reversed and remanded, holding that only a subset of the class had established Article III standing to sue TransUnion for its failure to use reasonable procedures to ensure the accuracy of their credit files — namely, those 1,853 class members whose credit reports had been provided to third-party businesses and who had suffered "concrete reputational harm" as a result. *Id.* at 417. With respect to the two claims relating to the formatting defects in the mailings, the Court held that no

14

class member other than the named plaintiff had demonstrated any concrete harm caused by the formatting errors, such that only he had standing to recover on those claims. *Id.* at 418.

In explaining its decision, the Court reiterated and emphasized that, "under Article III, an injury in law is not an injury in fact" and that "[o]nly those plaintiffs who have been *concretely harmed* by a defendant's statutory violation may sue that private defendant over that violation in federal court." *TransUnion*, 594 U.S. at 427. Put simply, "[n]o concrete harm, no standing." *Id.* at 417. The Court explained that while "[t]he most obvious" concrete injuries are "tangible harms, such as physical harms and monetary harms," "[v]arious intangible harms can also be concrete," depending on whether they have "a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." *Id.* at 425. Then, as is important here, the Court applied those principles to class actions, observing that "standing is not dispensed in gross." *Id*. at 431. It emphasized that federal courts lack "the power to order relief to any uninjured plaintiff, class action or not," *id*. (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 466 (2016) (Roberts, C.J., concurring)), and that, as a result, "[e]very class member must have Article III standing in order to recover individual damages," *id*. Moreover, "plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *Id.* Finally, the Court also made clear that the form of relief sought matters when assessing the sufficiency of the alleged harm. Thus, while "a person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring," *id*. at 435, "the risk

15

of future harm on its own does not support Article III standing for [a] damages claim," *id.* at 441.

Applying these principles to the facts before it, the Court held that the approximately 6,300 class members who failed to prove that the misleading alerts in their credit reports were ever provided to a third party "did not suffer a concrete harm," as necessary for them to recover damages for the reasonable procedures claim. *TransUnion*, 594 U.S. at 439. The Court rejected the argument that those class members had "suffered a concrete injury for Article III purposes because the existence of misleading . . . alerts in their internal credit files *exposed them to a material risk* that the information would be disseminated in the future to third parties and thereby cause them harm." *Id.* at 435 (emphasis added). And it was also unpersuaded by the plaintiffs' argument that it could infer that those class members' credit reports had been sent to third parties because "all of the class members [had] requested copies of their reports, and consumers usually do not request copies unless they are contemplating a transaction that would trigger a credit check." *Id.* at 439. Rejecting that contention, the Court reasoned that "[t]he plaintiffs had the burden to prove at trial that their reports were actually sent to third-party businesses" and that "[t]he inferences on which the argument rests are too weak to demonstrate that the reports of any particular [class member was] sent to third-party businesses." *Id.* Finally, the Court concluded that, other than the named plaintiff, none of the class members had "demonstrated that the format of TransUnion's mailings" — even if not in compliance with the statute — caused them "any harm *at all*," let alone "a harm with a close relationship to

16

a harm traditionally recognized as providing a basis for a lawsuit in American courts." *Id.* at 440.

Following *TransUnion*, it is thus clear that to recover damages from the defendants, "*[e]very class member must have Article III standing*" "for each claim that they press," requiring proof that the challenged conduct caused each of them a concrete harm. 594 U.S. at 431 (emphasis added). It is equally clear that, to establish their standing to recover damages, the plaintiffs *cannot rely on a "mere risk of future harm." Id.* at 437 (emphasis added). Thus, for standing purposes, it is plainly insufficient for the plaintiffs to argue that Quicken Loans and Title Source's inclusion of borrowers' home-value estimates on the form used to hire an appraiser created *a risk* that each class member would receive an inflated appraisal, which, in turn, would enhance *the risk* that they would wind up owing more on their refinanced mortgage loans than their homes were actually worth, which could, in turn, lead to concrete, real-world economic harm. Yet, while the plaintiffs continue to assert that Quicken Loans' "appraisal practices created *serious risks* for [its] customers," they nonetheless acknowledge that after *TransUnion*, such risk cannot establish the concrete injury necessary for standing. (Emphasis added). Moreover, they also seem to acknowledge that they lack evidence that the class members' appraisals were actually inflated, let alone that any such inflation was attributable to the inclusion of the borrowers' estimate on the appraisal request form *or* that any attributable appraisal inaccuracy ended up causing any of them concrete harm. Disavowing the need for any such evidence, they instead rest on their broad assertion that their "Article III injury is straightforward: They each suffered financial harm by paying [the defendants] hundreds of

17

dollars 'for *independent* appraisals that . . . they never received.'" (Emphasis added) (quoting *Alig*, 990 F.3d at 791).

The district court on remand adopted and relied on this position in persisting with its earlier judgment that the class members have standing. The district court held,

> "Plaintiffs paid an average of $350 for *independent* appraisals that . . . they never received. Instead, they received appraisals that were *tainted* when Defendants [1] exposed the appraisers to the borrowers' estimates of value and [2] pressured them to reach those values."

> *       *       *

> Each of the plaintiffs and class members paid up front for a fair, valid and reasonable appraisal of the property. Due to the actions of the defendants, they did not receive [such] appraisals.

(Emphasis added) (quoting *Alig*, 990 F.3d at 791–92). The district court, however, did not point to any evidence of the circumstances under which class members received, used, or were harmed by the actual appraisals they received. Thus, its decision rested simply on the two reasons it gave in its holding. *First*, the court stated that the appraisals that class members received were influenced (*i.e.*, "tainted") by the defendants' "expos[ing] the appraisers to the borrowers' estimates." But mere exposure to the borrowers' estimates could only establish *potential* influence, *i.e.*, a risk of influence, and such a risk cannot be the basis for standing to recover damages under *TransUnion*. *See* 594 U.S. at 431. *Second*, the court accepted that the defendants "pressured" the appraisers "to reach" the borrowers' estimates. But there was no evidence to support that the class members' appraisers were subjected to pressure. Indeed, there was no evidence that any appraiser for a class member failed to provide an independent appraisal. Yet, *TransUnion* requires the plaintiffs to "set

18

forth" "specific facts," "supported adequately by the evidence," to show each class member's standing to recover damages. *Id*. While it is true that the general practice followed at the time involved the defendants' transmitting the borrowers' home-value estimates to prospective appraisers, the record shows little beyond that, and all that it *does* show tends to establish that class members indeed received independent appraisals.

Each appraiser who testified — including the plaintiffs' experts — stated that they developed all of their appraisals independently, not based on the borrowers' estimates. Moreover, the appraisers confirmed that they certified truthfully on each appraisal that it was based on his or her "own personal, unbiased, and professional analysis"; that it was not "conditioned on any agreement or understanding" on what value to give; and that it was prepared in accordance with the industry's Uniform Appraisal Standards. Indeed, there is evidence in the record that some appraisers completed their appraisals *without even seeing* the borrowers' estimates and other evidence that property evaluations were completed *even before* the appraiser had personally received the request form.

In short, while the plaintiffs' and the district court's theory is that injury of class members was shown because they each paid a fee for an appraisal that was tainted by the borrowers' home-value estimates and therefore was worthless, there is no evidence that the class members' appraisals were in fact tainted, rendering them worthless. Yet, *TransUnion* clearly requires such a *factual* showing for each class member to claim damages. *See* 594 U.S. at 431 (explaining that "standing is not dispensed in gross" to the class but rather must be demonstrated for every class member with "specific facts").

19

Moreover, the plaintiffs' and district court's theory distortingly dissociates the appraisals from the refinancing transactions that they supported. A home appraisal is not an independent consumer product but is instead part of a larger financial transaction. The function of the appraisal in a loan transaction is to provide assurance that there is adequate collateral for the loan in the event the borrower should default. And, as we have previously observed, it is "not the borrower but the bank that typically is disadvantaged by an under-collateralized loan." *McFarland v. Wells Fargo Bank, N.A.*, 810 F.3d 273, 280 (4th Cir. 2016). Practically speaking, the class members paid money for appraisals, as required by their lender, so that they could benefit financially from refinancing their home mortgages, and the appraisals they received allowed them to complete those refinancing transactions. In that sense, also, the appraisals were far from "worthless." They fully accomplished their designed purpose.

Finally, we observe that the Appraisal Standards Board — the body responsible for developing the Uniform Appraisal Standards — expressly recognized that an appraiser's mere receipt of a homeowner's estimate before conducting an appraisal was *not* inconsistent with the appraiser's obligation to perform their appraisals with "*impartiality, objectivity, and independence.*" (Emphasis added). Moreover, when the appraisers in this case reported their appraisals, they did so on a form on which they certified that they had performed the appraisal "in accordance with" their profession's ethical requirements. This too cuts strongly against the plaintiffs' central premise that the class members' appraisals were not "independent."

20

At bottom, the plaintiffs' class-wide showing in this case is simply "too speculative to support Article III standing." *TransUnion*, 594 U.S. at 438. And therefore, standing for the class members' damages claims has not been demonstrated.

III

Accordingly, we reverse the portion of the district court's judgment certifying a class and awarding it damages and direct that this action proceed hereafter only as to the individual named plaintiffs. We affirm the portion of the district court's judgment, including damages, on the named plaintiffs' statutory and conspiracy claims for the reasons given in our earlier decision. *See Alig*, 990 F.3d at 798–808. We vacate the portion of the district court's judgment on the merits of the named plaintiffs' breach of contract claim for the reasons given in our earlier decision, *see id*. at 794–98, and we remand for further proceedings on that claim.

IT IS SO ORDERED.

FLOYD, Senior Circuit Judge, dissenting:

I agree with the majority to the extent it concludes the named plaintiffs possess Article III standing and remands their breach of contract claim to the district court for the reasons we gave in our prior decision in this case. *See Alig v. Quicken Loans, Inc.*, 990 F.3d 782, 794–98 (4th Cir. 2021). However, I disagree that the class must be decertified because I believe the unnamed class members have also demonstrated they suffered concrete injury resulting from Quicken's appraisal process and therefore possess standing. I would affirm the district court's judgment on that point as well. Because the majority concludes otherwise, I respectfully dissent.

I.

My disagreement with the majority lies in its determination that insufficient facts have been alleged to establish Article III standing for the unnamed class members. Specifically, the majority reasons that there was "no evidence" that the class members' appraisals were affected by Quicken's disseminating borrower home-value estimates to appraisers and pressuring them to reach those values. Majority Op. 19. Therefore, it concludes, the unnamed class members have not made a sufficient showing of harm based upon "specific facts" to satisfy Article III standing. *Id.* (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021)).

But, as I read the record, the class members have made that very showing. They sought relief under West Virginia's consumer protection statutes, which permit a court to act when a loan agreement was "unconscionable at the time it was made" or "induced by

22

unconscionable conduct." W. Va. Code § 46A-2-121; *see also id.* § 46A-2-121(2) (providing "affirmative misrepresentations, active deceit or concealment of a material fact" as examples of "unconscionable conduct"). Plaintiffs' theory of harm is that they paid an average of $350 each for independent appraisals of their homes, and that they did not receive independent appraisals. The class members allege those appraisals instead had been tainted when Quicken supplied borrower value estimates to appraisers and pressured appraisers to meet those values, which are aspects of the refinancing process the company concealed from the plaintiffs.

Those allegations are borne out in the record: it demonstrates Quicken requested the value estimates and sought to pressure appraisers to match those values. For example, internal Quicken emails show they had a team dedicated to "push[ing] back on appraisers questioning their appraised values" and their process involved "arguing over value appeal orders and debating values with bankers and appraisers." *Alig*, 990 F.3d at 803. And an appraiser testified that he would "get a call" from Quicken's co-defendant appraisal management company TSI "if [the appraisal] wasn't at the estimated value." *Id.*

Both the named and unnamed class members suffered financial harm when they paid for independent appraisals they did not receive because of Quicken's conduct. And "financial harm is a classic and paradigmatic form of injury in fact" for purposes of Article III standing. *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 760 (4th Cir. 2018) (quoting *Cottrell v. Alcon Labs.*, 874 F.3d 154, 163 (3d Cir. 2017)). Therefore, even assuming the results of the appraisals was the same with or without Quicken's behind-the-scenes conduct, the actionable harm arose when the class members paid for an appraisal which

23

was deficient under West Virginia's consumer protection law. *See McFarland v. Wells Fargo Bank, N.A.*, 810 F.3d 273, 285 (4th Cir. 2016) (recognizing cause of action under § 46A-2-121 "for unconscionable conduct that causes a party to enter into a loan").

Finally, I disagree with the proposition that the fact the plaintiffs received a benefit through refinancing their home cuts against Article III standing. To be sure, the named plaintiffs "improved their cash flow," Majority Op. 9, and other class members at the very least received a benefit in the form of new, presumably more favorable, loan terms. However, West Virginia law recognizes that lender conduct can still be actionable under the state's consumer protection statutes even if the borrower received a benefit from the transaction. *See Quicken Loans, Inc. v. Brown*, 737 S.E.2d 640, 651, 658–59 (W. Va. 2012) (rejecting argument that lender could not be held liable for substantive unconscionability when borrower purchased new vehicle, retired other existing debt, and made payments on new loan with the benefit of refinancing proceeds).

"[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion*, 594 U.S. at 431. I believe the plaintiffs in this case — named and unnamed class members alike — have made the required showing because they paid for appraisals that the record shows were deficient as a matter of West Virginia law. Accordingly, I would hold the unnamed class members in this case possess Article III standing.

24

II.

In sum, I would conclude that the Supreme Court's ruling in *TransUnion* has not undermined the class members' standing in this litigation because those individuals suffered tangible financial harm.  I also see no reason to depart from the remaining reasoning in our now-vacated 2021 decision in this case.  *See Alig*, 990 F.3d at 786–808.  Therefore, I would reinstate the opinion we issued affirming the district court's decision to certify a class and grant it summary judgment on their statutory and conspiracy claims and remanding for further consideration the class's contractual claim.  *See id.*  Because the majority takes a different course of action, I respectfully dissent.